**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

CHARLES RICHARD RILEY,
Plaintiff-Appellant,

v.

JAMES M. DORTON,
Defendant-Appellee.

SOUTH CAROLINA SHERIFF'S

ASSOCIATION; J. AL CANNON, Sheriff
of Charleston, South Carolina;
VIRGINIA DEPARTMENT OF
CORRECTIONS; VIRGINIA SHERIFFS
ASSOCATION; VIRGINIA ASSOCIATION
OF CHIEFS OF POLICE; VIRGINIA STATE
POLICE ASSOCIATION,
Amici Curiae.

No. 94-7120

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Albert V. Bryan, Jr., Senior District Judge.
(CA-94-259)

Argued: December 3, 1996

Decided: June 16, 1997

Before WILKINSON, Chief Judge, and RUSSELL, WIDENER,
HALL, MURNAGHAN, ERVIN, WILKINS, NIEMEYER,
HAMILTON, LUTTIG, WILLIAMS, MICHAEL, and MOTZ,
Circuit Judges, sitting en banc.

_____

Affirmed by published opinion. Chief Judge Wilkinson wrote the majority opinion, in which Judges Russell, Widener, Wilkins, Niemeyer, Hamilton, Luttig, and Williams joined. Judge Hamilton wrote a concurring opinion. Judge Michael wrote a dissenting opinion, in which Judges Hall, Murnaghan, Ervin, and Motz joined.

_____

**COUNSEL**

**ARGUED:** Steven H. Goldblatt, Director, Appellate Litigation Clinical Program, GEORGETOWN UNIVERSITY LAW CENTER, Washington, D.C., for Appellant. Joseph Paul Rapisarda, Jr., County Attorney, COUNTY OF HENRICO, VIRGINIA, Richmond, Virginia, for Appellees. Sandra J. Senn, STUCKEY & SENN, Charleston, South Carolina, for Amici Curiae South Carolina Sheriff's Association and Cannon. **ON BRIEF:** Michelle J. Anderson, Supervising Attorney, Mary J. Clark, Supervising Attorney, Ellen R. Finn, Supervising Attorney, Joseph C. Brandt, Student Counsel, Ajay K. Gambhir, Student Counsel, Gregory C. Lisa, Student Counsel, Appellate Litigation Clinical Program, GEORGETOWN UNIVERSITY LAW CENTER, Washington, D.C., for Appellant. James T. Moore, III, Assistant County Attorney, COUNTY OF HENRICO, VIRGINIA, Richmond, Virginia, for Appellees. Stephanie P. McDonald, STUCKEY & SENN, Charleston, South Carolina, for Amici Curiae South Carolina Sheriff's Association, et al. James S. Gilmore, III, Attorney General, Mark R. Davis, Senior Assistant Attorney General, Lance B. Leggitt, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL, Richmond, Virginia, for Amicus Curiae Department of Corrections. Patrick A. O'Hare, Walter A. Marston, Jr., HAZEL & THOMAS, Richmond, Virginia, for Amici Curiae Virginia Sheriffs Association, et al.

_____

**OPINION**

WILKINSON, Chief Judge:

Pretrial detainee Charles Riley sued Henrico County police detective James Dorton, alleging that the officer had used excessive force

2

against Riley while he was at the police station awaiting booking. The district court granted Officer Dorton's motion for summary judgment based on its conclusion that any injuries Riley may have suffered were <u>de minimis</u>. We reject appellant's attempts to characterize this as an interrogation case. We hold that Riley's claims are properly analyzed under <u>Bell v. Wolfish</u>, 441 U.S. 520 (1979), and the Fourteenth Amendment. We further hold that the purely <u>de minimis</u> level of injury alleged by this inveterate malcontent does not constitute the kind of excessive force amounting to punishment that <u>Bell</u> requires.

I.

At approximately 11:30 a.m. on March 31, 1993, detective Dorton arrested Riley on charges of rape, sodomy, and abduction for immoral purposes, pursuant to outstanding warrants. Riley was handcuffed and taken to the Norfolk Police Department. He was then released into the custody of detective Dorton and another officer, detective Ross, who transported Riley to Henrico County.

Upon his arrival at the Public Safety Building in Henrico County at 1:30 p.m., Riley's handcuffs were removed briefly to permit him to sign a waiver for DNA samples to be taken without a search warrant. Riley refused to sign the waiver, so detective Dorton replaced the handcuffs and told Riley he would stay handcuffed until Dorton got a search warrant. Riley alleges that Dorton also insulted Riley and his family, both in the car and at the Public Safety Building. According to Riley, Dorton called Riley's family "a bunch of dumb country hicks" and threatened to tie Riley to a tree and leave him. When Dorton asked Riley at the Public Safety Building if he knew "what scum looked like," Riley responded by asking whether Dorton had "looked in the mirror lately."

The events that transpired in the next 30 seconds form the basis for Riley's claim. Riley alleges that Dorton became angry at Riley's insult, came over from the desk where he had been filling out papers, and inserted the tip of his pen a quarter of an inch into Riley's nose, threatening to rip it open. Riley claims that Dorton also threatened to throw him into a corner and beat him, and that Dorton slapped him across the face with "medium" force, scraping Riley's face with his fingernails.

3

Riley's handcuffs were again removed at approximately 3:30 p.m. so that Riley could eat a hamburger Dorton had bought for him. Shortly after he ate, Riley was transported to a hospital where DNA samples were taken pursuant to the search warrant which Dorton had obtained. Riley's cuffs were removed at the hospital, and again later during booking at the Public Safety Building. Riley concedes that the handcuffing was not continuous, that the handcuffs were not too tight, that he was properly cuffed behind his back according to state procedure, and that the discomfort he suffered from the handcuffs disappeared each time they were removed.

There is no medical evidence that Dorton ever inflicted any injury on Riley. Riley saw medical personnel approximately sixty times during the fifteen months following his arrest, complaining about virtually every conceivable physical ailment, but he never once complained to medical staff that he had been injured by the handcuffs, pen, or slap. Records from dozens of mental health sessions reflect no mention of the incident. Nonetheless, Riley filed a section 1983 action against detective Dorton, alleging excessive force in connection with the handcuffs, pen, slap, and threats. The district court granted summary judgment for Dorton on the grounds that Riley had at most suffered only de minimis injury. A divided panel of this court reversed and remanded for trial. Riley v. Dorton, 93 F.3d 113 (4th Cir. 1996). We agreed to hear the case en banc, and we now affirm the district court.

II.

The Supreme Court has instructed us that "[i]n addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force." Graham v. Connor, 490 U.S. 386, 394 (1989). We must therefore first determine whether Riley's claims are governed by the Fourth, Fifth, Eighth, or Fourteenth Amendment.

A.

The Fourth Amendment governs claims of excessive force during the course of an arrest, investigatory stop, or other "seizure" of a person. Graham v. Connor, 490 U.S. at 388. The events about which

4

Riley complains, however, took place at least two hours and ninety miles from the time and place of Riley's arrest. Furthermore, as Riley concedes, Dorton arrested him pursuant to a valid warrant. "[A]s one lawfully arrested and being held prior to a formal adjudication of guilt," Riley is adjudged in our circuit to be a pretrial detainee. United States v. Cobb, 905 F.2d 784, 788 (4th Cir. 1990); see also Cooper v. Dyke, 814 F.2d 941, 948 (4th Cir. 1987).

Riley urges this court to broaden Fourth Amendment protection beyond the point of arrest to cover all persons in pretrial detention. The Supreme Court, however, has declined to adopt Riley's position, having reserved the question in Graham v. Connor :

> Our cases have not resolved the question whether the Fourth Amendment continues to provide individuals with protection against the deliberate use of excessive physical force beyond the point at which arrest ends and pretrial detention begins, and we do not attempt to answer that question today. It is clear, however, that the Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment.

Id. at 395 n.10.

Riley argues that more recent Supreme Court precedent, Albright v. Oliver, 510 U.S. 266 (1994), "all but commands" us to apply the Fourth Amendment to Riley's pretrial detention. Riley's reliance on Albright, however, is misplaced. The Court in Albright was addressing not a claim of excessive force after arrest, but rather a claim that the police lacked probable cause to initiate a criminal prosecution against Kevin Albright. In deciding that Albright's case should have been brought under the Fourth Amendment rather than the Due Process Clause of the Fourteenth, a plurality of the Court noted that "[t]he Framers considered the matter of pretrial deprivations of liberty, and drafted the Fourth Amendment to address it." Id. at 274.

Applying the Fourth Amendment to deprivations of liberty, however, is not a new or remarkable proposition. The Court had previously stated in Gerstein v. Pugh, 420 U.S. 103 (1975), that the Fourth Amendment was the constitutional provision to use when evaluating

5

questions of probable cause for arrest and detention. A deprivation of liberty, however, is not the same thing as a condition of detention. For "evaluating the constitutionality of conditions or restrictions of pre-trial detention," the Supreme Court has specifically directed that the "proper inquiry" is "whether those conditions or restrictions amount to punishment of the detainee" under the Due Process Clause. Bell v. Wolfish, 441 U.S. at 535. As in Bell,"[w]e are not concerned with the initial decision to detain an accused and the curtailment of liberty that such a decision necessarily entails," 441 U.S. at 533-34, but rather with the conditions of ongoing custody following such curtailment of liberty.

It is true that Justice Ginsburg, who joined the plurality in Albright, also wrote separately to argue that the concept of a"continuing sei-zure" justified applying the Fourth Amendment beyond the point of arrest. She contended that the seizure of a person, as contemplated by the Fourth Amendment, does not end after arrest, but continues as long as the person is "seized" (either in custody or on bail) by the government. Justice Ginsburg therefore concluded that Fourth Amendment protections should extend to the end of trial. Albright, 510 U.S. at 276-81 (Ginsburg, J., concurring). With all respect, we cannot, as Riley urges, apply the suggestion of a single Justice in the face of squarely contrary Supreme Court precedent. Because we believe that Bell instructs us to analyze excessive force claims of pre-trial detainees under the Due Process Clause of the Fourteenth Amendment, we shall not extend the Fourth Amendment to cover Riley's situation.

A review of the Supreme Court's basic jurisprudence reinforces our refusal to adopt the "continuing seizure" theory of the Fourth Amendment. Decades of Fourth Amendment precedent have focused on the initial deprivation of liberty. See Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment (3d ed. 1996). The core of this Fourth Amendment jurisprudence thus addresses arrest -- what constitutes an arrest, California v. Hodari D., 499 U.S. 621 (1991); what constitutes probable cause to make an arrest, Henry v. United States, 361 U.S. 98 (1959); Draper v. United States, 358 U.S. 307 (1959); when probable cause must be found by a neutral magis-trate, County of Riverside v. McLaughlin, 500 U.S. 44 (1991); Gerstein v. Pugh, 420 U.S. 103 (1975); which officials may issue a

6

warrant, <u>Shadwick v. City of Tampa</u>, 407 U.S. 345 (1972); what type of information is required to support a valid warrant, <u>Whiteley v. Warden</u>, 401 U.S. 560 (1971); <u>Giordenello v. United States</u>, 357 U.S. 480 (1958); and what force may be used during an arrest, <u>Graham v. Connor</u>, 490 U.S. 386 (1989); <u>Tennessee v. Garner</u>, 471 U.S. 1 (1985). The remaining cases concentrate on identifying at what point, short of arrest, an individual may have suffered a deprivation of personal freedom implicating the Fourth Amendment. <u>E.g.</u>, <u>Michigan v. Chesternut</u>, 486 U.S. 567 (1988); <u>INS v. Delagado</u>, 466 U.S. 210 (1984); <u>United States v. Mendenhall</u>, 446 U.S. 544 (1980); <u>United States v. Brignoni-Ponce</u>, 422 U.S. 873 (1975); <u>Davis v. Mississippi</u>, 394 U.S. 721 (1969); <u>Terry v. Ohio</u>, 392 U.S. 1 (1968).

This body of Supreme Court precedent simply reflects the Fourth Amendment's core concerns. The Amendment establishes that "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures, shall not be violated." This guarantee does not stand alone, however, but is coupled with strictures on the issuance of warrants, indicating that the Amendment is directed at the <u>arrest</u> of persons and not at the conditions of their custody. The requirements for securing a warrant have nothing to tell us about the conditions controlling subsequent detention. By its own terms, the Fourth Amendment thus applies to the "initial decision to detain an accused," <u>Bell</u>, 441 U.S. at 533-34, not to the conditions of confinement after that decision has been made. Indeed, in defining the nature of "seizure" in the context of an arrest, the Supreme Court quoted <u>Thompson v. Whitman</u>, 18 Wall. 457, 471 (1874), for the proposition that "[a] seizure is a single act, and not a continuous fact." <u>California v. Hodari D.</u>, 499 U.S. 621, 625 (1991).

Several of our sister circuits likewise have declined to adopt the "continuing seizure" concept and continue to apply the Fourteenth Amendment framework of <u>Bell v. Wolfish</u> rather than the Fourth Amendment to excessive force claims of pretrial detainees. As the Fifth Circuit recently explained:

> First, the text of the Fourth Amendment -- prohibiting unreasonable "seizures" -- does not support its application to a post-arrest encounter. Second, the Supreme Court has refused to apply the Fourth Amendment to protect inmates

7

> after incarceration. And third, <u>Graham</u> and <u>Bell v. Wolfish</u> (refusing to concede that Fourth Amendment applied to pretrial detainee subjected to body cavity search), dictate that the Due Process Clause is the appropriate constitutional basis for pretrial detainee excessive force suits.

<u>Brothers v. Klevenhagen</u>, 28 F.3d 452, 456 (5th Cir. 1994) (citations omitted). The Seventh Circuit has also endorsed the position that the Fourth Amendment's text limits "seizure" to the "initial act of seizing." <u>Wilkins v. May</u>, 872 F.2d 190, 192 (7th Cir. 1989). While recognizing that <u>Albright</u> "casts considerable doubt on the applicability of substantive due process" to malicious prosecution and probable cause challenges, <u>Garcia v. City of Chicago</u>, 24 F.3d 966, 971 n.6 (7th Cir. 1994), the Seventh Circuit continues to reject the concept of continuing seizure in excessive force cases, <u>Reed v. City of Chicago</u>, 77 F.3d 1049, 1052 n.3 (7th Cir. 1996). The Eleventh Circuit likewise recently reconfirmed that "[c]laims involving the mistreatment of arrestees or pretrial detainees in custody are governed by the Fourteenth Amendment's Due Process Clause . . . ." <u>Cottrell v. Caldwell</u>, 85 F.3d 1480, 1490 (11th Cir. 1996).

The Second, Sixth, and Ninth Circuits do extend Fourth Amendment coverage to the period the suspect remains with the arresting officers. <u>See Powell v. Gardner</u>, 891 F.2d 1039, 1044 (2d Cir. 1989) ("Fourth Amendment standard probably should be applied at least to the period prior to the time when the person arrested is arraigned or formally charged, and remains in the custody (sole or joint) of the arresting officer"); <u>McDowell v. Rogers</u>, 863 F.2d 1302, 1306 (6th Cir. 1988) (Fourth Amendment seizure "continues throughout the time the person remains in the custody of the arresting officers"); <u>Robins v. Harum</u>, 773 F.2d 1004, 1010 (9th Cir. 1985) ("once a seizure has occurred, it continues throughout the time the arrestee is in the custody of the arresting officers"). We shall not, however, apply the "arresting officer" rule to Riley's case. In addition to lacking textual and precedential support, this rule would have Fourth Amendment coverage depend upon the fortuity of how long an arresting officer happens to remain with a suspect. If the arresting officer

8

quickly transferred custody of the arrestee to a back-up officer, he could bring Fourth Amendment protection to an abrupt end.**1**

In sum, we agree with the Fifth, Seventh, and Eleventh Circuits that the Fourth Amendment does not embrace a theory of "continuing seizure" and does not extend to the alleged mistreatment of arrestees or pretrial detainees in custody.

B.

If he is not covered by the Fourth Amendment, Riley contends that he was at least the subject of custodial interrogation and that he can therefore invoke protection against self-incrimination. Riley's Fifth Amendment claim, however, suffers from a variety of flaws.

To begin with, Riley gave no incriminating statement to the officers. Courts have not found Fifth Amendment violations where no statements whatsoever were made. See, e.g., Mahan v. Plymouth County House of Corrections, 64 F.3d 14, 17 (1st Cir. 1995) (finding no Fifth Amendment violation where suspect made no statements pertinent to the investigation against him). Indeed, following the plain text of the Amendment that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself," most courts refuse to find a Fifth Amendment violation even where statements were made, but were not actually used in a criminal proceeding. Weaver v. Brenner, 40 F.3d 527, 535 (2d Cir. 1994) (finding no Fifth Amend-

---

**1** The Ninth and Tenth Circuits hold that the Fourth Amendment also applies to persons arrested without warrants until a probable cause hearing is held. Pierce v. Multnomah County, Oregon , 76 F.3d 1032, 1042 (9th Cir. 1996) ("Fourth Amendment sets the applicable constitutional limitations on the treatment of an arrestee detained without a warrant up until the time such arrestee is released or found to be legally in custody based upon probable cause for arrest"); Austin v. Hamilton, 945 F.2d 1155, 1160 (10th Cir. 1991) (Fourth Amendment "impose[s] restrictions on the treatment of the arrestee detained without a warrant"). Riley was arrested pursuant to valid arrest warrants. To the extent that the Ninth and Tenth Circuits rest their rule on an absence of an arrest warrant, see Austin, 945 F.2d at 1158-60; Pierce, 76 F.3d at 1043, it is therefore inapplicable to this case. To the extent that these cases represent another variation of the continuing seizure rule, we cannot accept their reasoning.

9

ment violation when no evidence was used in a criminal proceeding); Mahoney v. Kersey, 976 F.2d 1054, 1061 (7th Cir. 1992) ("Fifth Amendment does not forbid the forcible extraction of information but only the use of information so extracted as evidence in a criminal case" (citation omitted)); Davis v. City of Charleston, 827 F.2d 317, 322 (8th Cir. 1987) (finding no Fifth Amendment violation where suspect's statements were not used against her during trial).

Indeed, only the Ninth Circuit has held that a Fifth Amendment violation may occur even when compelled statements are never used at a criminal proceeding. Cooper v. Dupnik, 963 F.2d 1220, 1238-45 (9th Cir. 1992) (en banc). This circuit has already criticized Cooper's reasoning, however, noting that the dissenters in that case made "persuasive arguments that the privilege against self-incrimination is not violated until the evidence is admitted in a criminal case." Wiley v. Doory, 14 F.3d 993, 998 (4th Cir. 1994) (Powell, J.); see also Giuffre v. Bissel, 31 F.3d 1241, 1256 (3d Cir. 1994) (expressing approval for the position of the dissenters in Cooper).

If anything, the Supreme Court has been even more emphatic on this point than the circuits. The Court has noted that the Fifth Amendment right against self-incrimination is a fundamental trial right, Withrow v. Williams, 507 U.S. 680, 691 (1993), and "applies only when the accused is compelled to make a testimonial communication that is incriminating," Fisher v. United States, 425 U.S. 391, 408 (1976) (emphasis omitted). While Fifth Amendment concerns can certainly be implicated prior to trial, the Supreme Court has declared that a Fifth Amendment violation occurs only when self-incriminating statements are introduced at trial, thereby compelling the defendant to "become a witness against himself."

> The privilege against self-incrimination guaranteed by the Fifth Amendment is a fundamental trial right of criminal defendants. Although conduct by law enforcement officials prior to trial may ultimately impair that right, a constitutional violation occurs only at trial.

United States v. Verdugo-Urquidez, 494 U.S. 259, 264 (1990) (citations omitted). Any Fifth Amendment claim here thus fails, because

10

Riley never made a statement, much less a statement that was used at trial.

Moreover, Riley's efforts to characterize his interaction with detective Dorton as interrogation fail. The Supreme Court has held that in the context of the Fifth and Fourteenth Amendments,

> the term "interrogation" . . . refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.

Rhode Island v. Innis, 446 U.S. 291, 301 (1980). At oral argument, this court questioned counsel about whether the activities at issue in this case even qualified as custodial interrogation. Riley does not allege that the detectives ever directly questioned him regarding his crimes. Indeed, Riley's time at the Henrico County Public Safety Building was not devoted to any questioning about his offenses but rather to routine criminal processing -- fingerprinting, obtaining DNA samples, and setting bond. Further, Riley fails to identify any words or conduct of the officers which were "reasonably likely to elicit an incriminating response." Id. at 301. Even Riley's version of his encounter with the detectives is best characterized as a tawdry exchange of insults rather than an attempt on the part of the officers to get Riley to confess. The much ballyhooed pen incident, for example, was at most an emotional response to Riley's earlier insult rather than a ploy to obtain incriminating information. Finally, we reject Riley's suggestion that the officers' request that he sign a waiver consenting to DNA testing constitutes interrogation. Such a request is no more an interrogation than a request that a drunk driver submit to a blood alcohol test. See South Dakota v. Neville , 459 U.S. 553, 564 n.15 (1983).

The dissent also attempts to push the hot button of interrogation in an effort to salvage Riley's case. The record simply fails to support the dissent's assertions. The indicia of interrogation are notably absent -- indeed, the record is devoid as to what was asked or what was obtained. The dissent cannot point to a single incriminating statement made by Riley. The dissent cannot point to a single statement

11

used against Riley at trial. The dissent cannot point to a single shred of evidence that Riley sustained injury. The dissent cannot even point to a single question asked of Riley regarding his crimes. Indeed, all the dissent can do is try to weave a fleeting incident and a request that Riley consent to DNA testing into an interrogation scenario.[2] Our dissenting colleague suggests that Detective Dorton made no statement denying that interrogation took place, but no denial is necessary to refute that which has never been established. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (Rule 56(c) mandates entry of summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case."). If the dissent's view of "interrogation" is accepted, then all varieties of interaction between a custodian and a pretrial detainee in the course of processing can henceforth be characterized as covert questioning. Notwithstanding the dissent's misapprehension, Innis does not extend that far.

In sum, no incriminating statement was made; no such statement was introduced at trial; and no interrogation was in fact conducted.[3] Perforce, there can be no Fifth Amendment violation.

_____

[2] Riley's own deposition contradicts the dissent's assertion that the officers sought to obtain a second waiver from him:

> Q So . . . it was two things [Dorton] was asking you to agree to; one was to talk without a lawyer and the other was to agree to have the specimens taken?
>
> A No, he asked me to sign a waiver.
>
> Q And you didn't know what the waiver was?
>
> A Well, all I know is what he told me.
>
> Q And what did he tell you?
>
> A He told me it was so that I'd take my own DNA instead of them taking it like that. I'd pluck my own hair.

[3] Riley's reliance on Gray v. Spillman, 925 F.2d 90 (4th Cir. 1991), is misplaced for this same reason. In Gray, this court held that "the existence of physical injury is not an essential element of a § 1983 claim when a person during custodial interrogation is beaten or psychologically intimidated in a manner equivalent to beating." Id. at 94. This case stands in stark contrast to the facts of Gray. In Gray, the defendants allegedly

12

C.

Similarly, Riley's claims are not properly analyzed under the Eighth Amendment ban against cruel and unusual punishment. The Eighth Amendment does not apply "until after conviction and sentence." Graham, 490 U.S. at 392 n.6. Riley's case clearly had not reached the point of a formal adjudication of guilt at the time of the events at issue.

D.

Having established the inapplicability of the Fourth, Fifth, and Eighth Amendments, we conclude that the excessive force claims of pretrial detainees are governed by the Due Process Clause of the Fourteenth Amendment, which provides the standard for "evaluating the constitutionality of conditions or restrictions of pretrial detention." Bell, 441 U.S. at 535. While "[i]t is fundamental that the state cannot hold and physically punish an individual except in accordance with due process of law," the Supreme Court has stated that under the Fourteenth Amendment "[t]here is, of course, a de minimis level of imposition with which the Constitution is not concerned." Ingraham v. Wright, 430 U.S. 651, 674 (1977). Similarly, the Court has held that "[t]he Eighth Amendment's prohibition of `cruel and unusual' punishments necessarily excludes from constitutional recognition de minimis uses of physical force." Hudson v. McMillian, 503 U.S. 1, 9-10 (1992). In Norman v. Taylor, 25 F.3d 1259, 1263 (4th Cir. 1994) (en banc), we applied the Hudson rule, holding that "a plaintiff cannot prevail on an Eighth Amendment excessive force claim if his injury is de minimis." In light of Bell and Ingraham, we conclude that the

_____

questioned Gray directly about his crimes, kept him for several hours without food and water, did not allow him to use the restroom, beat him such that he required surgery, and threatened him with further beating unless he confessed. Id. at 91. Gray was also asked to sign an incriminating statement and a waiver of his right to counsel, and he eventually made such a statement. Id. Riley, in contrast, never alleges that he was questioned, significantly injured, threatened for failure to discuss the crimes, or deprived of necessities. Riley's case simply does not fall under Gray.

13

holding of <u>Norman</u> extends to excessive force claims of pretrial detainees.

Notwithstanding their respective perspectives on the matter of punishment, the Eighth and the Fourteenth Amendment approaches share much in common. Both seek to balance the rights of prisoners and pre-trial detainees against the problems created for officials by the custodial context. "The management by a few guards of large numbers of prisoners, not usually the most gentle or tractable of men and women," accurately depicts the tensions inherent in custodial settings, be they pre-trial or post-conviction. <u>Johnson v. Glick</u>, 481 F.2d 1028, 1033 (2d Cir. 1973). And the management of a single truculent individual may cause difficulties for a custodian as well. The Eighth and Fourteenth Amendments thus establish only qualified standards of protection for prisoners and pretrial detainees-- against "cruel and unusual punishment" and against "excessive force that amounts to punishment," respectively. U.S. Const. amend. VIII; <u>Graham</u>, 490 U.S. at 395 n.10 (citing <u>Bell</u>, 441 U.S. at 535-39). Thus, inherent in the Eighth and Fourteenth Amendments is the principle that:

> [N]ot . . . every malevolent touch by a prison guard gives rise to a federal cause of action. <u>See Johnson v. Glick</u>, 481 F.2d at 1033 ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights").

<u>Hudson</u>, 503 U.S. at 9.

To permit those in custody to bring excessive force claims without any showing of injury would violate that very principle. The <u>de minimis</u> nature of Riley's alleged injuries cannot be squared with Riley's need to demonstrate excessive force amounting to punishment. <u>Bell</u>, 441 U.S. at 535. Punishment must mean something more than trifling injury or negligible force. Otherwise, every touch would be actionable and every alleged "push or shove" would entitle plaintiff to a trial. This is no idle concern. Those in detention often detest those charged with supervising their confinement, and seek to even the score through the medium of a lawsuit. The Constitution, however, does not exist to scoop up every last speck of detainee discontent. To hold that every incident involving contact between an officer

14

and a detainee creates a constitutional action, even in the absence of injury, trivializes the nation's fundamental document.

Moreover, the Supreme Court has specifically admonished that the Constitution is not a "font of tort law" to be"superimposed upon whatever systems may already be administered by the States." Paul v. Davis, 424 U.S. 693, 701 (1976). "Although`the least touching of another in anger is a battery,' Cole v. Turner , 6 Mod. 149, 87 Eng.Rep. 907, 90 Eng.Rep. 958 (K.B. 1704) (Holt, C.J.), it is not a violation of a constitutional right actionable under 42 U.S.C. § 1983." Johnson, 481 F.2d at 1033. But without a de minimis threshold, every "least touching" of a pretrial detainee would give rise to a section 1983 action under the Fourteenth Amendment. Not only would such a rule swamp the federal courts with questionable excessive force claims, it would also constitute an unwarranted assumption of federal judicial authority to scrutinize the minutiae of state detention activi-ties. The de minimis rule thus serves the interest of our federal system by distinguishing claims which are cognizable under the Constitution from those which are solely within the jurisdiction of state courts.

An injury need not be severe or permanent to be actionable under the Eighth Amendment, but it must be more than de minimis. Norman, 25 F.3d at 1262-63. We think this same rule applies to excessive force claims brought by pre-trial detainees.

III.

Riley contends that he has suffered both physical and psychologi-cal injury from his encounter with detective Dorton. He claims he experienced pain from being cuffed behind his back for six hours, and pain and a welt from the slap on the face. He also alleges that the pen incident caused him to fear for his life and safety, and that he now experiences nightmares and depression, and fears being assaulted whenever he is handcuffed.

The record simply fails to bear out Riley's allegation of injury. In fact, the opposite conclusion emerges -- that Riley has cried rivers of crocodile tears over every aspect of his detention except the very encounter of which he now complains. Riley has not hesitated to report any psychological or physical discomfort, no matter how tri-

15

fling, to medical staff. In a span of less than fifteen months at Henrico County Jail after his arrest, Riley met with medical personnel approximately sixty times. He requested medical attention for a stream of physical ailments, including a hangnail, an ingrown toenail, a runny nose, a chill, dizzy spells, a "knot" in his groin, broken skin between his toes, and soreness in his back, neck, ear, throat, and left thumb. He complained that he needed to soak his foot after losing a toenail, that his cellmate kept him awake, and that his back pain prevented him from relinquishing his bottom bunk to a fellow inmate who had suffered "only" a leg injury. Riley even sought medical authorization to receive boxer underwear instead of briefs because of a mole on his thigh (which medical staff, after examination, deemed unaffected by his type of undergarments).

Riley's list of alleged psychological discomforts is equally impressive. In dozens of mental health sessions, he complained of being depressed for several years and of having crying spells once or twice a day. He expressed fear of harassment by other inmates and found it difficult to deal with their teasing and taunting. He frequently reported being discouraged by the course of his legal defense, the potential sentence he faced, the societal reaction to his offenses, and the possible outcome of his eventual trial. He grew angry after hearing the testimony of certain witnesses, and he worried about conflicts between his girlfriend and his family. More than once, he related suicidal urges. Examiners reported that "Mr. Riley can turn on tears at will," and he "rather enjoys making manipulative gestures and threats to get attention," an assessment "[h]e did not deny."

In light of this seemingly endless list of medical complaints, one would expect to find at least some mention of the physical and psychological injury he supposedly suffered as a result of the handcuffing, pen, threats and slap. But the Health Services Administrator at Henrico County Jail, where Riley was detained, "found no record of any complaints by Mr. Riley to either medical or mental health staff of injury to, or discomfort in, [his] nose or shoulders which relates to his allegations." She also "found no record of any concerns related to the alleged threats" by detective Dorton among Riley's scores of mental health sessions. Riley's own testimony, in fact, is that he never specifically complained of any injury from the incidents he now identifies in this suit. In short, Riley has compiled a singular record as a

16

chronic, uninhibited complainer, yet he never once mentioned the events which he now asserts caused him substantial injury.

If this court were to hold that Riley's claim presented a triable issue, the consequences would be all too easy to foresee. Amicus Virginia Department of Corrections advises us that it is inundated by an ongoing "tide of meritless prisoner claims" virtually identical to Riley's -- claims where contrary to plaintiffs' allegations, the evidence shows no injury at all or injury that is at the very most de minimis. Noting the supposed pen incident "took approximately 30 seconds" and left no evidence of injury, the district court appropriately and commonsensically dismissed this action. **4** While we do not require that an injury be serious or leave visible marks or scars, we do conclude that "de minimis injury can serve as conclusive evidence that de minimis force was used." Norman, 25 F.3d at 1261. To hold otherwise would make the most minor and fanciful custodial incidents the routine subjects of federal lawsuits.

IV.

We affirm the judgment of the district court granting summary judgment to the defendant.

AFFIRMED

_____

**4** In a last-ditch effort, Riley argues that even if the Fourth Amendment does not apply and his injuries are de minimis , he is still entitled to relief because the force used against him was of a sort"repugnant to the conscience of mankind," Hudson v. McMillian , 503 U.S. at 10, and thus "expressly outside the de minimis force exception," Norman, 25 F.3d at 1263 n.4. This contention is completely meritless. The exchange of verbal barbs and angry slap described by Riley in his complaint, even if taken as entirely true, is certainly not the sort of behavior that "shocks the conscience" like forcibly pumping a suspect's stomach for evidence after unlawfully entering his house and bedroom, Rochin v. California, 342 U.S. 165 (1952), or severely whipping and hanging a suspect in order to obtain a confession, Brown v. Mississippi, 297 U.S. 278 (1936). Therefore, Riley's case falls squarely within the de minimis category.

17

HAMILTON, Circuit Judge, concurring:

I join Chief Judge Wilkinson's opinion and add this brief statement to express my understanding of today's holding. The court holds that excessive force claims of state pretrial detainees are not to be governed by the Fourth, Fifth, or Eighth Amendments, but rather the Due Process Clause of the Fourteenth Amendment. The court further holds that excessive force claims of state pretrial detainees, based on state conduct occurring outside the context of a custodial interrogation, are subject to the de minimis injury standard set forth in Norman v. Taylor, 25 F.3d 1259 (4th Cir. 1994) (en banc). The court, however, leaves intact the principle established in Gray v. Spillman, 925 F.2d 90, 93-94 (4th Cir. 1991), that a state pretrial detainee's rights under the Due Process Clause of the Fourteenth Amendment are violated if he is beaten or sufficiently threatened during the course of a custodial interrogation. Dorton's assault on Riley did not occur during a custodial interrogation; therefore, Riley has no claim under the Due Process Clause of the Fourteenth Amendment unless his injuries were more than de minimis. Because Riley's injuries, if any, were no more than de minimis, his Fourteenth Amendment claim fails. With these observations, I join Chief Judge Wilkinson's opinion.

MICHAEL, Circuit Judge, dissenting:

The record does not support the majority's conclusion that Riley was not being questioned when a detective stuck a pen up Riley's nose, threatened to rip it open, and then slapped him. As a result, a standard requiring more than de minimis injury cannot be invoked to bar Riley's claim. For "the existence of physical injury is not an essential element of a § 1983 claim when a person during custodial interrogation is beaten or psychologically intimidated in a manner equivalent to beating." Gray v. Spillman, 925 F.2d 90, 94 (4th Cir. 1991). Because Riley's claim fits squarely under Gray, I respectfully dissent.

I.

The majority begins its analysis by deciding "whether Riley's claims are governed by the Fourth, Fifth, Eighth, or Fourteenth Amendment." Ante at 4. Characterizing Riley's complaint as an

18

excessive force claim by a pretrial detainee, the majority then proceeds to find the Fourth, Fifth, and Eighth Amendments to be inapplicable. Ultimately, the majority concludes that Riley's claim is governed by the Due Process Clause of the Fourteenth Amendment under the standard set forth in Bell v. Wolfish , 441 U.S. 520 (1979).

Bell, however, did not deal with the protection the Due Process Clause affords to a pretrial detainee who is being interrogated. Instead, Bell examined conditions and restrictions of pretrial detention alleged to be unconstitutional, such as "double bunking" (two inmates in a room designed for one), a "publisher only" rule (inmates only allowed hardcover books mailed directly from the publisher or bookstore), and the practice of body cavity searches following contact visits. See id. at 541-43, 548-60. According to Bell the "proper inquiry" for evaluating these claims about "conditions or restrictions of pretrial detention" is whether they "amount to punishment of the detainee." Id. at 535.

Nothing in Bell restricts the actual right upheld in Gray v. Spillman -- namely, the right not to be "beat[en] and threaten[ed] . . . in the course of custodial interrogation." Gray, 925 F.2d at 93. This right, like the protections afforded to pretrial detainees, stems from the Due Process Clause. However, this right to be free from physical violence and coercion during custodial interrogation affords more protection than the general due process right (considered in Bell) relating to conditions of pretrial detention. The right not to be beaten during custodial interrogation gets closer to the core of the liberty interest and thus warrants more stringent standards.

Two wrong turns by the majority have led to its failure to recognize that the due process right confirmed in Gray forms the basis for a § 1983 claim by Riley. First, the majority believes that any right to be free from coercion during interrogation can come only from the Fifth Amendment's protection against self-incrimination. Since Riley does not appear to have made any incriminating statements, the majority concludes that the Fifth Amendment is inapplicable to his claim. Second, the majority concludes that the physical abuse and threats alleged by Riley did not take place during a custodial interrogation. I will explain how the majority got off course.

19

A.

The majority does not dispute that the Constitution protects individuals against coercion during an interrogation. However, it only discusses this protection in the context of the Fifth Amendment right against self-incrimination. See U.S. Const. amend. V ("No person . . . shall be compelled in any criminal case to be a witness against himself . . . ."). In discussing this right, the majority contends that the Fifth Amendment is only violated when a compelled statement is actually used in a criminal proceeding. Since Riley does not claim to have given a statement to the interrogating officers, the majority reasons, he cannot bring a § 1983 claim under the Fifth Amendment.

The majority does have some support for its argument that actions can be brought under the Self-Incrimination Clause only if a confession has been obtained and offered in court. See, e.g., Wilkins v. May, 872 F.2d 190, 194 (7th Cir. 1989) (noting that it would be "odd" to find a violation of the Self-Incrimination Clause if a confession was not obtained and then used in a criminal case). The majority is wrong, however, if it means to suggest that violence and threats during custodial interrogation are unconstitutional only if a confession is wrung out and subsequently used. To so hold would overrule Gray, since in Gray the plaintiff's confession was not used at his criminal trial. See Gray, 925 F.2d at 91. More importantly, such a holding would be based on an erroneous belief that constitutional protections against coercion during interrogation stem only from the Self-Incrimination Clause.

As this court said in Gray, "[i]t has long been held that beating and threatening a person in the course of custodial interrogation violates the fifth and fourteenth amendments of the Constitution." Id. at 93. Although Gray does not specify the exact source of its protections for custodial interrogation, it has clearly based them on the Due Process Clause. See Wiley v. Doory, 14 F.3d 993, 998 n.11 (4th Cir. 1994) ("Gray relies on cases involving violations of the Due Process Clause rather than the Self-Incrimination Clause."). In Adamson v. California, 332 U.S. 46, 54 (1947), which Gray cites for support, the Supreme Court said that "[t]he due process clause forbids compulsion to testify by fear of hurt, torture or exhaustion." Later cases have confirmed that "[t]he due process violation caused by coercive behavior

20

of law-enforcement officers in pursuit of a confession is complete with the coercive behavior itself." Cooper v. Dupnik, 963 F.2d 1220, 1244-45 (9th Cir. 1992) (en banc). For example, in Wilkins v. May, 872 F.2d 190 (7th Cir. 1989), the plaintiff brought a Bivens action in which he claimed that two federal agents had interrogated him while pointing a gun at his head. In determining whether "brutal police conduct in custodial interrogation states a constitutional claim," the court expressed doubt as to whether the Self-Incrimination Clause was violated. Id. at 194. The court did find, however, that the plaintiff stated a claim under the Due Process Clause. See id. at 195 ("It is for the trier of fact to decide whether a particular incident involving interrogation at gunpoint is so terrifying in the circumstances as to constitute a deprivation of liberty within the meaning of the due process clause.").

Moreover, even some who may agree with the majority's limitation on actions based on the right against self-incrimination have noted that the Due Process Clause protects against coercion alone. See Weaver v. Brenner, 40 F.3d 527, 534 (2d Cir. 1994) (noting that "[t]he right of a citizen to be free from [police coercion during custodial interrogation] is guaranteed by the Due Process Clause of the Fourteenth Amendment"); Cooper, 963 F.2d at 1253 (Brunetti, J., dissenting) (since the police interrogation techniques "involved no physical abuse or threats of physical abuse," the plaintiff had not "stated a valid § 1983 claim under a due process theory"). Indeed, to hold otherwise would make physical force constitutionally permissible unless the suspect actually confessed and the confession was later used in a criminal proceeding. That cannot be the law. See Cooper v. Dupnik, 924 F.2d 1520, 1538 (9th Cir. 1989) (Noonan, J., concurring in part and dissenting in part), rev'd en banc , 963 F.2d 1220 (9th Cir. 1992).

B.

I recognize, of course, that Detective Dorton's assault on Riley had to occur during interrogation for Riley to take advantage of the special due process protection that prohibits the police from resorting to violence during custodial questioning. The majority concludes that "Riley's time at the Henrico County Public Safety Building was not devoted to any questioning about his offenses but rather to routine

21

criminal processing." <u>Ante</u> at 11. The circumstances and the summary judgment record simply do not support this conclusion.*

Riley had just been arrested on warrants charging him with abduction, rape, and sodomy -- crimes for which corroborating witnesses are often not available. This is exactly the circumstance where the police would be expected to question the suspect, and the undisputed summary judgment record compels the conclusion that Riley was indeed questioned.

First, it appears that Detective Dorton attempted to get Riley to sign a waiver of his right to a lawyer during interrogation. The majority points out that Riley was asked to sign a waiver consenting to DNA testing, but Dorton also wanted Riley to sign a"waiver to talk to [Dorton] without the presence of an attorney." J.A. 250. According to Riley, Dorton offered to buy him a meal "to get me to sign a waiver, to talk to him." J.A. 250. Second, in describing the events that led up to the assault, Riley testified as follows in his deposition:

> Then they started up again during his interrogation, and he [Detective Dorton] was asking me, you know, you know, different things like my fat sister, is she a whore, and things like that, you know, and just trying to get me to break[ ]down.

J.A. 266. The use of insults is a well-known method of interrogation aimed at getting the suspect to "break down." <u>See</u> James Becket, Barbarism in Greece 112 (1970) (describing an interrogation technique in which "the prisoner is verbally assaulted by obscenities, lies, and threats," such as "how is it with a mother who is a whore?"). Similarly, Riley states that after the assault, "Detective Dorton left the room, and then Detective Ross started trying to play-- they tried to play the `good cop/bad cop' routine." J.A. 276. This routine, too, is a standard interrogation technique. <u>See Miranda v. Arizona</u>, 384 U.S. 436, 452 (1966) ("One ploy often used has been termed the `friendly-

_____

*The majority seems to forget that on appeal from summary judgment we must view "the facts and inferences in the light most favorable to the non-moving party," <u>i.e.</u>, Riley. <u>Donmar Enters., Inc. v. Southern Nat'l Bank of N.C.</u>, 64 F.3d 944, 946 (4th Cir. 1995).

22

unfriendly' or the `Mutt and Jeff' act . . . ."). Finally, there is an additional indication in Riley's deposition that the officers were looking to get a statement from him. In response to a question whether the officers had denied him the right to counsel, Riley responded:

> I didn't make any statements, even though I understand that through my attorney[']s motion for discovery[in the criminal case] that Officer Dorton claims that I made a statement, but I did not make any statements.

J.A. 275.

Throughout the proceedings in the district court, where Riley appeared pro se and prepared his own papers, he continually described the underlying encounter as an "interrogation." See Plaintiff's Motion at J.A. 179 ("The assault occured[sic] during interrogation . . . ."); Plaintiff's Memorandum in Support of Plaintiff's Answer to the Defendant's Motion to Dismiss at J.A. 228-29 (noting that "the assault occurr[ed] during the interrogation process"); Plaintiff's Affidavit at J.A. 232 (describing the underlying events as taking place "[d]uring the interrogation process"); Plaintiff's Deposition at J.A. 266 ("Then they started up again during his interrogation . . . ."). Detective Dorton never challenged the "interrogation" description in district court.

Because of Detective Dorton's acquiescence on this point, the majority places too much weight on Riley's "fail[ure] to identify any words or conduct of the officers which were `reasonably likely to elicit an incriminating response.'" Ante at 11 (quoting Rhode Island v. Innis, 446 U.S. 291, 301 (1980)). As noted, Detective Dorton did not once dispute Riley's assertion that the incident took place during interrogation. In particular, Riley was not challenged on this in his deposition, and Detective Dorton did not offer any evidence to contradict Riley's numerous statements that he was being interrogated. If the detective had offered something to indicate that there was no interrogation, then Riley might have been compelled to respond with more specific facts. As things stand, what Riley did offer is uncontradicted, and it is sufficient to establish that the incident occurred during interrogation. The majority's effort to construct a different picture is simply contrary to the record.

23

Indeed, the majority's refusal to recognize this as a custodial interrogation case is causing it needless worry. Returning Riley's claim for trial would not mean that "every `least touching' of a pretrial detainee would give rise to a section 1983 action under the Fourteenth Amendment." Ante at 15. The reason is simple: there is a fundamental difference between the use of force in interrogation and the use of force to maintain good order and discipline among those in jail awaiting trial. No one is against jailors being able to do their jobs as custodians without the burden of frivolous lawsuits. The only thing I am against here is prohibited by a longstanding rule: when a jailor or custodian switches his role to investigator and begins interrogating a detainee, no physical force is constitutionally permissible. See Ware v. Reed, 709 F.2d 345, 351 (5th Cir. 1983). Applying this rule, which is already in the books, will not open the floodgates.

II.

Because we must accept for summary judgment purposes that Riley was being interrogated at the time of the alleged assault, he should be allowed to bring his § 1983 claim under the Due Process Clause's specific protections for interrogatees. The rule set forth in Gray is that "the existence of physical injury is not an essential element of a § 1983 claim when a person during custodial interrogation is beaten or psychologically intimidated in a manner equivalent to beating." Gray, 925 F.2d at 94. Thus, Riley's claim should survive summary judgment if he has proffered evidence that "he was beaten or sufficiently threatened, even if that did not result in any outward or inward manifestations of harm." Id. In his unchallenged deposition testimony and affidavits, Riley says that Detective Dorton repeatedly threatened and insulted him, stuck a pen up his nose, threatened to rip it open, and slapped him hard, causing his head to snap to the side and raising welts on his face. Because these abusive acts, which had nothing to do with maintaining order in the police station, took place during custodial interrogation, they provide the basis for a due process claim that survives summary judgment.

The majority erroneously applies a de minimis injury standard to Riley's claim of unjustified force during custodial interrogation. This is the wrong standard because the due process violation was complete the minute Detective Dorton resorted to physical abuse during the

24

questioning. Again, a detainee has an actionable right to be free from brutality while police <u>seek</u> a confession. Thus, when violence is used in custodial interrogation, the severity of a § 1983 plaintiff's injuries is relevant only to the question of damages, and a plaintiff may be awarded nominal damages and attorney's fees even if his injuries are not serious. <u>Id.</u> at 93-94 & n.1.

I respectfully dissent because Riley does have a claim. Judge Hall, Judge Murnaghan, Judge Ervin, and Judge Motz join in this opinion.

25