**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

DONALD THOMAS OSBORNE, JR.,
Plaintiff-Appellee,

v.

W. D. ROSE, Individually and in his

official capacity as an officer of the
Virginia Department of Game and
Inland Fisheries,
Defendant-Appellant.

No. 97-1259

DONALD THOMAS OSBORNE, SR.,
Plaintiff-Appellee,

v.

W. D. ROSE, Individually and in his

official capacity as an officer of the
Virginia Department of Game and
Inland Fisheries,
Defendant-Appellant.

No. 97-1264

Appeals from the United States District Court
for the Western District of Virginia, at Abingdon.
James P. Jones, District Judge.
(CA-96-59-A, CA-96-60-A)

Argued: October 27, 1997

Decided: January 20, 1998

Before WILKINSON, Chief Judge, MOTZ, Circuit Judge, and
CAMPBELL, Senior Circuit Judge of the
United States Court of Appeals for the First Circuit,
sitting by designation.

Dismissed in part, reversed in part, and remanded by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** William Mark Dunn, Assistant Attorney General, Richmond, Virginia, for Appellant. Dennis Eugene Jones, Lebanon, Virginia, for Appellee. **ON BRIEF:** Richard Cullen, Attorney General of Virginia, Richmond, Virginia, for Appellant.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Donald Osborne Sr. and his son, Donald Osborne Jr., sued Virginia game warden W.D. Rose after a violent encounter in November 1994. Their complaints included claims of excessive force and malicious prosecution brought under 42 U.S.C. § 1983. The district court denied Rose summary judgment on his defense of qualified immunity, and Rose filed this interlocutory appeal. With respect to the Osbornes' excessive force claims, we dismiss Rose's appeal because it would require us to resolve a genuine factual dispute between the parties. However, Rose is entitled to qualified immunity on the Osbornes' malicious prosecution claims because a constitutional right to be free from malicious prosecution was not clearly established in November 1994. Accordingly, we dismiss in part, reverse in part and remand the case to the district court.

I.

On the rainy morning of November 21, 1994, the opening day of deer hunting season in western Virginia, Rose observed a vehicle pro-

2

ceeding slowly down a country road. Rose observed that the driver (Osborne Sr.) wore hunting clothing though he did not get a good look at the passenger (Osborne Jr.); Rose suspected that they were hunting from an automobile in violation of Virginia law. Va. Code. Ann. § 29.1-521.6. He followed them at a distance in his state vehicle and onto a farm that belonged to Claude Osborne, father of Osborne Sr. The Osbornes were going to look for sick cattle on the family farm and fix a hay rick, then leave for a hunting trip in another part of the state.

From this point, the parties' accounts of events begin to diverge. Warden Rose alleges that, from a distance, he observed the Osbornes' car stop briefly and saw Osborne Jr. open the passenger door, sight a rifle from the car into the nearby woods, then pull the rifle back into the car. The Osbornes deny these allegations. Rose also alleges that, after the Osbornes became aware of his presence, Osborne Sr. drove wildly at Rose's vehicle, yelled at Rose, and made obscene gestures. The Osbornes deny these allegations as well. Shortly thereafter, the parties exited their vehicles, and a confrontation ensued.

Rose accused the Osbornes of hunting illegally. Osborne Sr. denied Rose's accusation and ordered Rose off of his family's property. During this heated exchange, Osborne Sr. placed his hand inside his hunting jacket and hooked his thumb inside his overalls. Fearing that Osborne Sr. was reaching for a weapon, Rose drew his service revolver and ordered Osborne Sr. to remove his hand. It is undisputed that Rose fired his weapon three times and struck Osborne Sr. once in the abdomen, but the parties disagree about why he began to shoot. Rose alleges that Osborne Sr. returned to his car, withdrew a rifle, and pointed it at Rose; Rose claims that he fired only after Osborne Sr. refused to drop the rifle. The Osbornes deny these allegations and insist that Rose shot at them after both Osbornes began to move back toward their car, approximately twenty feet away. The Osbornes fled the scene and drove back to the home of Osborne Sr.'s parents, located elsewhere on the farm. Rose radioed for assistance; other wardens arrived on the scene and took the Osbornes into custody.

Later that same day, Rose swore out a criminal complaint. The complaint alleged that Osborne Jr. hunted from the automobile and Osborne Sr. pointed a rifle at him. On the basis of Rose's complaint,

3

a magistrate issued criminal warrants charging both Osbornes with felonies of attempted murder and attempted abduction; Osborne Sr. was charged with the additional felony of using a firearm in an attempted murder. Both Osbornes were also charged with a misdemeanor of failure to obey a conservator of the peace, later amended to charges of impeding a game warden in the discharge of his duties. The Osbornes were arrested pursuant to these warrants and released on bail.

At a preliminary hearing on January 10, 1995, the prosecutor elected to dismiss the misdemeanor charges and proceed only on the felonies. The judge found no probable cause supported the felony charges. A grand jury later indicted both Osbornes with impeding a game warden and Osborne Sr. with brandishing a firearm.

At the Osbornes' criminal trial, an eyewitness, Charlie Glenn, denied that Osborne Sr. ever pointed a rifle at Rose. A ballistics expert testified that, based on the bullet marks in Osborne Sr.'s clothing, he could not have been holding a rifle when he was shot. A jury convicted Osborne Sr. of impeding a game warden but acquitted the Osbornes of all other charges.

Both Osbornes filed complaints against Rose alleging federal civil rights violations and pendent state claims of assault and battery. Rose sought summary judgment on the basis of qualified immunity and other grounds not relevant here. The district court consolidated the cases, dismissed Osborne Jr.'s battery claim, but otherwise denied Rose's motions for summary judgment. Rose brings this interlocutory appeal to challenge the denial of qualified immunity.

II.

Initially, we must determine our jurisdiction over this appeal. Ordinarily, a defendant may immediately appeal the denial of a qualified immunity defense. Behrens v. Pelletier, 116 S. Ct. 834, 839 (1996); Mitchell v. Forsyth, 472 U.S. 511, 526-27 (1985). In Johnson v. Jones, however, the Supreme Court held "that a defendant, entitled to invoke a qualified-immunity defense, may not appeal a district court's summary judgment order insofar as that order determines whether or

4

not the pretrial record sets forth a `genuine' issue of fact for trial." 115 S. Ct. 2151, 2159 (1995).

With these principles in mind, we examine our jurisdiction over Rose's appeal. With respect to the Osbornes' malicious prosecution claims, Rose challenges the district court's holding that a constitutional right to be free from malicious prosecution was clearly established. An appeal on this basis implicates precisely the sort of pure legal question that Mitchell and its progeny found appropriate for interlocutory review. Thus, we may consider the merits of Rose's appeal from the district court's order denying qualified immunity on these claims. Mitchell, 472 U.S. at 530; Winfield v. Bass, 106 F.3d 525, 529 (4th Cir. 1997) (en banc).

With respect to the excessive force claims, Rose does not raise an abstract legal question. Instead, he challenges the district court's holding that a genuine dispute existed over whether Rose's use of deadly force was reasonable. Qualified immunity protects an officer who uses deadly force where a reasonable officer could believe that a "suspect poses a threat of serious physical harm, either to the officer or to others." Tennessee v. Garner, 471 U.S. 1, 11 (1985).

Rose claims that he fired his weapon in self-defense. At the Osbornes' preliminary hearing and criminal trial, Rose testified that he fired his gun after Osborne Sr. took a rifle from his car and aimed it at Rose.

The Osbornes deny that Osborne Sr. ever pointed a rifle at Rose and rely on several facts in support of their position. Charlie Glenn, who witnessed the confrontation, testified at the criminal trial that he never saw Osborne Sr. point anything at Rose. Gerald Styers, a ballistics expert, testified that he had examined the bullet marks in Osborne Sr.'s clothing and concluded that Osborne Sr. was not holding a rifle at the time he was shot. The outcome of the criminal proceedings against the Osbornes lends additional credence to their version of the events. A judge dismissed the more serious charges against the Osbornes, including the charge that Osborne Sr. used a firearm in an attempted murder, and the jury at the Osbornes' criminal trial later acquitted Osborne Sr. of brandishing a firearm.

5

To determine whether Rose is entitled to qualified immunity on the Osbornes' excessive force claims, we would have to resolve a genuine dispute of material fact. This we cannot do. We thus dismiss this portion of the appeal.

III.

We now turn to the merits of Rose's appeal from the denial of qualified immunity on the Osbornes' malicious prosecution claims. The district court held, and the Osbornes argue, that Rose violated the Osbornes' constitutional right to be free from malicious prosecution. We believe that, at the time of the events in this case, real doubt existed over whether this traditional common law tort rose to the level of a constitutional violation. As a result, Rose is entitled to qualified immunity on the Osbornes' malicious prosecution claims.

Qualified immunity protects a public official in the discharge of his duties except where a reasonable official would know that an action violated clearly established constitutional rights. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Torchinsky v. Siwinski, 942 F.2d 257, 261 (4th Cir. 1991). Government officers, therefore, do not lose the shield of qualified immunity merely because their actions might transgress a common law duty. Anderson v. Creighton, 483 U.S. 635, 646 (1987). To interpret whether a right is "clearly established" by reference to state tort law would undermine qualified immunity and convert Section 1983 into "a font of tort law to be superimposed upon whatever systems may already be administered by the states." Paul v. Davis, 424 U.S. 693, 701 (1976). Rather, as the Supreme Court just recently emphasized, "civil liability under § 1983 . . . may be imposed for deprivation of a constitutional right if, but only if, `in the light of pre-existing law the unlawfulness [under the Constitution is] apparent.'" United States v. Lanier, 117 S. Ct. 1219, 1228 (1997) (quoting Anderson, 483 U.S. at 640) (modifications in original).

Many states, including Virginia, recognize the tort of malicious prosecution. See, e.g., Cuthrell v. Zayre of Va., Inc., 201 S.E.2d 779 (1974) (per curiam). The tort originated at common law and "permit[ted] damages for confinement imposed pursuant to legal process." Heck v. Humphrey, 512 U.S. 477, 484 (1994). In general, to state a

6

claim of malicious prosecution, a plaintiff must show (1) the initiation or maintenance of a proceeding against the plaintiff by the defendant; (2) termination of that proceeding favorable to the plaintiff; (3) lack of probable cause to support that proceeding; and (4) the defendant's malice. See W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 119, at 871 (5th ed. 1984).

The Osbornes maintain that Rose violated their constitutional right to be free from malicious prosecution when Rose swore out an allegedly perjurious affidavit in support of their criminal warrants and thereby initiated criminal proceedings against them. Rose may have committed a state tort, but his actions did not violate the Osbornes' clearly established constitutional rights. Shortly before these events, the Supreme Court had considered and rejected a Section 1983 claim of malicious prosecution grounded in the substantive due process guarantees of the Fourteenth Amendment. Albright v. Oliver, 510 U.S. 266, 275 (1994). While the Court divided on its reasoning, seven justices clearly held that the plaintiff in Albright could not maintain his claim for malicious prosecution. See id. at 275 (plurality opinion); id. (Scalia, J., concurring); id. at 281 (Ginsburg, J., concurring); id. at 283 (Kennedy, J., concurring in judgment and joined by Thomas, J.); id. at 291 (Souter, J., concurring in judgment). Prior to Albright, this circuit had recognized a constitutional right to be free from malicious prosecution, Goodwin v. Metts, 885 F.2d 157 (4th Cir. 1989), but we later recognized that Albright largely overruled Goodwin insofar as it grounded this right in "a liberty interest in avoiding prosecution on less than probable cause." Taylor v. Waters, 81 F.3d 429, 436 n.5 (4th Cir. 1996). Indeed, the several opinions in Albright threw into question whether there was any constitutional basis for a malicious prosecution claim and "add[ ] up to a fairly strong sentiment against constitutionalizing malicious prosecution." 1A Martin A. Schwartz, Section 1983 Litigation § 3.20, at 322 (3d ed. 1997).

The Osbornes accept that Albright foreclosed malicious prosecution claims based on the Fourteenth Amendment but contend that Albright recognized such claims brought under the Fourth Amendment. It is true that Albright left open this question, and, prior to November 1994, some courts read Albright in conjunction with earlier Supreme Court cases to permit malicious prosecution claims under the Fourth Amendment. See, e.g., Kelly v. Curtis, 21 F.3d 1544 (11th

7

Cir. 1994) (relying on Malley v. Briggs, 475 U.S. 335 (1986)). We do not believe, however, that the mere possibility that such claims might survive after Albright demonstrates that a constitutional right had reached the status of being clearly established. The plurality opinion offered "no view as to whether petitioner's claim would succeed under the Fourth Amendment." Albright, 510 U.S. at 275. As the Tenth Circuit noted:

> As many courts have observed, in many ways Albright muddied the waters rather than clarified them. Albright's discussion about the Fourth Amendment governing pretrial deprivations of liberty is dicta, inasmuch as Mr. Albright never alleged a Fourth Amendment violation. Thus, the Supreme Court specifically avoided deciding whether a Fourth Amendment malicious prosecution claim would succeed.

Taylor v. Meacham, 82 F.3d 1556, 1561 n.5 (10th Cir. 1996), cert. denied, 117 S. Ct. 186 (1996); see also Johnson v. Louisiana Dep't of Agric., 18 F.3d 318, 320 (5th Cir. 1994) ("Significantly, the [Albright] Court expressed no view whether [a malicious prosecution claim] would succeed under the Fourth Amendment."). In light of Albright's explicit reservation of this question, it cannot be read to establish clearly a Fourth Amendment right to be free from malicious prosecution.

Nor do we believe that this circuit's case law since Albright demonstrates that such a right was clearly established. In July 1994, this circuit found no Fourth Amendment violation in a case where a defendant submitted an allegedly perjurious affidavit in support of an arrest warrant. Wilkes v. Young, 28 F.3d 1362, 1364 (4th Cir. 1994). Because the purportedly perjurious statements were not necessary to the finding of probable cause, Wilkes declined to find any liability for the arrest. Id. at 1365. Wilkes, therefore, cannot be read to restore malicious prosecution claims to constitutional status. The Osbornes point to this circuit's opinion in Brooks v. City of Winston-Salem, 85 F.3d 178 (4th Cir. 1996), in support of their position. Brooks recognized that under some circumstances the Fourth Amendment includes a right to be free from malicious prosecution. Id. at 183-84; see also Riley v. Dorton, 115 F.3d 1159, 1162 (4th Cir.) (en banc), cert.

8

denied, 1997 WL 644679 (U.S. Dec. 15, 1997). But <u>Brooks</u> and <u>Riley</u> postdate the events in this case and, therefore, cannot demonstrate that a constitutional right was clearly established at the time of Rose's actions in November 1994.

"Section 1983 imposes liability for violations of rights protected by the Constitution, not for violations of duties of care arising out of tort law. Remedy for the latter type of injury must be sought in state court under traditional tort-law principles." <u>Baker v. McCollan</u>, 443 U.S. 137, 146 (1979). Rose indeed may have committed the common law tort of malicious prosecution. The Osbornes have not advanced this claim, and we offer no opinion on whether it would succeed. We do conclude, however, that, in the wake of <u>Albright</u>, substantial doubt existed over whether to give this ordinary state tort constitutional dignity. <u>See Roche v. John Hancock Mut. Life Ins. Co.</u>, 81 F.3d 249, 256 (1st Cir. 1996) ("The law is settled that a garden-variety claim of malicious prosecution garbed in the regalia of § 1983 must fail."). As a result, in November 1994, a reasonable officer could not have known that Rose's actions violated the Osbornes' constitutional rights. <u>Lanier</u>, 117 S. Ct. at 1228. Thus, Rose is entitled to qualified immunity on the Osbornes' malicious prosecution claims.*

IV.

In summary, we dismiss for want of jurisdiction the appeal from the denial of qualified immunity on the excessive force claims. We reverse that portion of the district court's order denying Rose qualified immunity on the Osbornes' malicious prosecution and false arrest

_____

*In denying Rose qualified immunity, the district court held that the Osbornes stated independent claims for false arrest and malicious prosecution and that both sets of claims may go to trial. We have reviewed the record and the pleadings and conclude that the Osbornes' false arrest claims merely repeat their malicious prosecution claims. On appeal, the Osbornes argue that they pled independent false arrest claims based on their detention before a magistrate issued the criminal warrants. But the Osbornes based their claims on an arrest pursuant to a warrant, and we are loathe to allow them to construct a new theory on appeal. Thus, we also reverse the district court's order insofar as it would allow any false arrest claims to go to trial.

9

claims. The malicious prosecution and false arrest claims must now be dismissed, and the excessive force claims may proceed to trial.

<u>DISMISSED IN PART, REVERSED IN PART, AND REMANDED</u>

10