RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 08a0211p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

SHAUN LEARY,

        *Plaintiff-Appellee,*

    *v.*

LIVINGSTON COUNTY et al.,

        *Defendants,*

SCOTT STONE and DENIS MCGUCKIN,

        *Defendants-Appellants.*

> Nos. 06-2603/2604

---

Appeal from the United States District Court
for the Eastern District of Michigan at Ann Arbor.
No. 03-60021—Marianne O. Battani, District Judge.

Argued: November 27, 2007

Decided and Filed: June 10, 2008

Before: CLAY, SUTTON, and McKEAGUE, Circuit Judges.

---

## COUNSEL

**ARGUED:** John H. Dise, Jr., DISE & ASSOCIATES, Southfield, Michigan, Thomas A. Matthews, Brighton, Michigan, for Appellants. Michael J. Kemnitz, Detroit, Michigan, for Appellee. **ON BRIEF:** John H. Dise, Jr., Gina U. Puzzuoli, DISE & ASSOCIATES, Southfield, Michigan, Thomas A. Matthews, Brighton, Michigan, for Appellants. Michael J. Kemnitz, Detroit, Michigan, for Appellee.

    SUTTON, J., delivered the opinion of the court, in which McKEAGUE, J., joined. CLAY, J. (pp. 6-14), delivered a separate dissenting opinion.

---

## OPINION

---

    SUTTON, Circuit Judge. Not long after word spread at the Livingston County Jail that detainee Shaun Leary had been charged with raping a nine-year-old girl, several prisoners beat him up. At stake in this § 1983 action is, one, whether officer Scott Stone was deliberately indifferent to Leary's safety needs and, two, whether officer Denis McGuckin used excessive force against Leary when he hit him on the back of his neck while walking him to his cell. As to Stone, we affirm

1

the district court's denial of qualified immunity; as to McGuckin, we reverse the district court's denial of qualified immunity because the force used was *de minimis*.

## I.

Just after noon on Friday, February 11, 2000, police arrested Leary on charges of criminal sexual conduct against a minor and brought him to the Livingston County Jail. During the intake process later that night, according to Leary, officer Denis McGuckin called Leary a "sick prick" and struck him on the back of the neck. JA 640. That same evening, according to Leary, officer Scott Stone "mention[ed] to [Leary] that once other inmates found out what he did that there would be no protection from anyone here at the jail," JA 391, and proceeded to tell other inmates that Leary "was in for raping a nine year old girl," JA 846. The inmates began harassing Leary about the child-rape charges on Sunday morning and beat him severely that evening. An ambulance took him to the hospital, where he was treated for facial fractures and a skull fracture.

Leary filed this § 1983 action against Livingston County, Stone and McGuckin. In ruling on the defendants' motions for summary judgment, the district court denied qualified immunity to Stone as to the deliberate-indifference claim against him and denied qualified immunity to McGuckin as to the excessive-force claim against him. Stone and McGuckin filed this interlocutory appeal.

## II.

To overcome a qualified-immunity defense in the setting of a constitutional tort, a plaintiff must establish (1) that the defendant violated a "constitutional right" and (2) that the right "was clearly established." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). We decide the first question before we reach the second one. *Id.* at 200.

### A.

Before addressing the merits of Stone's appeal, we must consider a jurisdictional question. For some time now, it has been clear that we may entertain interlocutory appeals from government officials challenging a denial of qualified immunity. *See Mitchell v. Forsyth*, 472 U.S. 511, 527 (1985). But that jurisdiction does not extend to appeals that merely quibble with the district court's reading of the factual record, as opposed to appeals that challenge the legal premises of the district court's decision—such as what the relevant constitutional provision requires, whether plaintiff's record-supported allegations violate that constitutional guarantee and whether that constitutional right was clearly established at the time of the underlying incident. *See Behrens v. Pelletier*, 516 U.S. 299, 313 (1996); *Johnson v. Jones*, 515 U.S. 304, 319–20 (1995); *Floyd v. City of Detroit*, 518 F.3d 398, 404–05 (6th Cir. 2008); *Livermore ex rel. Rohm v. Lubelan*, 476 F.3d 397, 403 (6th Cir. 2007).

Stone's appellate papers are not a model of clarity. Some of his arguments merely push back on the district court's reading of the record-supported factual allegations, including most conspicuously what the record says about Stone's knowledge of the risk of harm to Leary. If that were all Stone's appeal did, we would lack jurisdiction over it. *See Estate of Carter v. City of Detroit*, 408 F.3d 305, 310 (6th Cir. 2005). But that is not all Stone's appeal does. Even after "taking the facts in the light most favorable to" Leary, Stone's appeal also presents "a series of strictly legal questions," *Phelps v. Coy*, 286 F.3d 295, 298–99 (6th Cir. 2002): Did the conditions facing Leary pose an objectively "substantial risk of serious harm"? *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *see* Br. at 23 (arguing that Leary could show no "substantial risk of serious harm" because Leary neither took the threats seriously nor sought help and because the officers were not aware of similar assaults in the past). And was the alleged constitutional violation "so clearly established at the time of the events in question that a reasonable officer would have known" that

his conduct was unlawful in the situation he confronted? *Phelps*, 286 F.3d at 298; *see* Br. at 25–29 (citing the reasonable-officer standard on each page); Reply Br. at 16 (arguing that Leary did not meet his "burden to prove that no reasonable officer would have acted in the manner that Officer Stone acted in"); *id.* at 17 (arguing that Leary has not shown "that it would be clear to a reasonable officer that his conduct was unlawful in a situation he confronted"); *see also id.* at 15 ("[T]here is no clearly established law prohibiting a jail officer from talking to an inmate about another's charge . . . ."). Because "these are the kind of questions that may be raised by interlocutory appeal . . . [,] we have jurisdiction over this appeal." *Phelps*, 286 F.3d at 298–99; *see also Livermore*, 476 F.3d at 403.

To say that we have jurisdiction over Stone's appeal, however, is not to say that he should prevail. To raise a cognizable deliberate-indifference claim, an inmate must show that the alleged mistreatment was "objectively" serious and that the defendant "subjectively" ignored the risk to the inmate's safety. *Farmer*, 511 U.S. at 829, 834. On this record and at this stage of the case, Leary has satisfied these requirements.

*Objectively*, the harm facing Leary was "sufficiently serious." *Id.* at 834 (internal quotation marks omitted). Stone told two inmates, Duane Kimmel and Ross Hinchey, that Leary had been charged with raping a nine-year-old girl. McGuckin verified the risk of serious harm that Leary would face if the inmates learned of his charges: He "told [Leary] to keep his mouth shut about his charges . . . [f]or his own safety" because he "fear[ed that someone might] assault[] him [for] a charge like that." JA 696–97. Stone's statement to Leary that "once other inmates found out what he did[,] there would be no protection from anyone here at the jail," JA 391, confirmed that the inmates' knowledge of such charges posed an objectively serious risk of harm.

*Subjectively*, Stone's own words show he was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]" and that he "dr[ew] the inference." *Farmer*, 511 U.S. at 837. "[O]nce other inmates found out what [Leary] did," Stone knew there was reason to believe that Leary would need "protection . . . at the jail," JA 391, and he persisted in telling other inmates about Leary's charges despite that knowledge. Nor does the record offer any evidence that Stone took any reasonable steps to protect Leary from the known substantial risk of serious harm.

Not only has Leary established a cognizable claim of deliberate indifference, but he also has shown that the right was clearly established: "[P]rison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners." *Farmer*, 511 U.S. at 833 (internal quotation marks omitted); *see also id.* at 834, 837. It thus would have been "clear to a reasonable officer that [this] conduct was unlawful in the situation [Stone] confronted." *Saucier*, 533 U.S. at 202. The district court correctly rejected Stone's motion for summary judgment.

B.

Because Leary is a pretrial detainee, he brings his excessive-force claim against McGuckin under the Fourteenth Amendment's Due Process Clause, which "protects a pretrial detainee from the use of excessive force that amounts to punishment." *Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989); *see also United States v. Budd*, 496 F.3d 517, 530 (6th Cir. 2007). By contrast, convicted prisoners may bring excessive-force claims under the Eighth Amendment, *see Graham*, 490 U.S. at 395 n.10, and "free citizen[s]" may bring such claims under the Fourth Amendment, *see id.* at 394. While there is room for debate over whether the Due Process Clause grants pretrial detainees more protections than the Eighth Amendment does, *see id.* at 395 n.10, we need not resolve that debate here. Under either constitutional guarantee, an excessive-force claimant must show something more than *de minimis* force. *See Hudson v. McMillian*, 503 U.S. 1, 9–10 (1992) (Eighth Amendment);

*Bell v. Wolfish*, 441 U.S. 520, 539 n.21 (1979) (Due Process Clause); *Budd*, 496 F.3d at 530–31; *see also Riley v. Dorton*, 115 F.3d 1159, 1167 (4th Cir. 1997) (en banc).

The undisputed facts in this case show that Leary's single allegation of force—that McGuckin hit him "[i]n the back of the neck" with the side of his hand, performing "a karate chop kind of deal"—was *de minimis*. JA 654. Leary, to start with, did not suffer any objectively verifiable injury from the blow. There was no hospital visit after the encounter, no doctor's visit, no bruise, nothing in short to indicate that the encounter rose above a "negligible [use of] force" or caused anything more than a "trifling injury." *Riley*, 115 F.3d at 1167. There is a good reason, it turns out, why there was no identifiable manifestation of injury: Leary himself testified at his deposition that the hit "didn't hurt or nothing," that he "didn't have any injury" and that he never sought any medical treatment. JA 654. If "not . . . every malevolent touch by a prison guard gives rise to a federal cause of action," *Hudson*, 503 U.S. at 9, it would seem to follow that a "malevolent" hit to the back of the neck that, in the claimant's words, "didn't hurt or nothing" does not give rise to a federal cause of action either, *cf. Budd*, 496 F.3d at 531 (explaining that more than *de minimis* force was alleged where the plaintiff testified that, after an assault, he requested medical attention and "had bumps on his head and bruising on his body"); *Carlton v. Turner*, No. 05-1009, 2006 WL 955886, at *2 (6th Cir. Apr. 12, 2006) (explaining that more than *de minimis* force was alleged where "plural assaults drew blood").

While Leary said that McGuckin used "a karate chop kind of deal" when hitting him on the back of the neck, he not only downplayed the possibility that the force "hurt" him when he testified at his deposition, but he also downplayed at his deposition any notion that the officer was trying to hurt him. JA 654. As he testified, McGuckin "didn't hit [him] that hard." *Id.* And, as he further testified, apparently to downplay the amount of force used, McGuckin hit him "the way a woman would hit a man." *Id.*; *see also Bell-Bey v. Mayer*, No. 98-1425, 1999 WL 1021859, at *2 (6th Cir. Nov. 3, 1999); *cf. Budd*, 496 F.3d at 531 (explaining that more than *de minimis* force was used where an officer "rammed [plaintiff's] head into at least two different doors, slammed his head into a table, and repeatedly shoved him into a wall").

Nor can Leary create a triable issue of fact simply by pointing to discrepancies between *his* complaint (which said that the slap hurt) and *his* deposition testimony (which said that the slap did not hurt). When a claimant's testimony contradicts the allegations in his complaint, we will credit his later testimony. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (noting that a summary judgment motion "requires the nonmoving party to go beyond the pleadings"); Fed. R. Civ. P. 56(e)(2) ("When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must—by affidavits or as otherwise provided in this rule—set out specific facts showing a genuine issue for trial."); *see also Scott v. Harris*, 127 S. Ct. 1769, 1776 (2007); *Wysong v. City of Heath*, 260 F. App'x 848, 857 (6th Cir. Jan. 22, 2008). A claimant may not create a triable issue of fact by saying one thing in a complaint and something else in a deposition.

*Pelfrey v. Chambers*, 43 F.3d 1034 (6th Cir. 1995), does not lead to a different conclusion. There, we permitted an excessive-force claim to go to a jury where two officers pulled out their knives, approached the plaintiff, "grabbed" his hands and "forc[ed] them down to [his] side," placed their hands on his head and shoulder, "cut[] off a great portion of [his] hair" with a knife, let him go and "stood there grinning[,] smiling [and] laughing and dropping [his] hair on the floor." *Id.* at 1035 (internal quotation marks omitted). There is a considerable difference between the degree and nature of force used in that case and in this one. Not only did the officers "grab[]" the plaintiff's hands and "forc[e]" them down, but they also threatened him with weapons, held him in place and used a knife against him. They also instilled in the plaintiff an objective fear of serious physical harm—he was "scared, intimidated, and threatened," *id.* (internal quotation marks omitted)—something Leary does not claim and indeed positively disclaims by saying "it didn't hurt or nothing," JA 654.

Leary also relies on *Hardy v. Vieta*, 174 F. App'x 923 (6th Cir. Apr. 4, 2006), but that case bolsters the conclusion that McGuckin used *de minimis* force. In *Hardy*, an officer "purposefully and intentionally push[ed] a steel door on" the plaintiff, "smash[ing] him between the steel door and a brick wall [and] injuring his arm and lower back." *Id.* at 924. While "the extent of [the plaintiff's] injuries [was] not known," *id.* at 926, no evidence in the record contradicted his allegation that he was injured to some degree. No less importantly, pushing and smashing an inmate into a steel door—so much so that another inmate heard a sound "like the door hitting something," *id.* at 924 (internal quotation marks omitted)—differ in degree and kind from McGuckin's "karate chop kind of deal," which "didn't hurt" and was not "that hard," JA 654.

In the final analysis, this is an unusual case. It is not often that a constitutional tort claimant seeks relief for an alleged assault or battery but then says that the defendant's actions "didn't hurt or nothing" and never says that he felt threatened by the officer's action. That is why we can agree with our colleague's framing of the issue—that the question is whether the actual or threatened *force* was *de minimis*, not just whether the injury was *de minimis*—but not with his conclusion.

No doubt, the complaint in this case sufficed to move the action from the pleadings stage to discovery. But Leary's answers in discovery made it clear that McGuckin's actions, while rude and unprofessional, did not rise to the level of a cognizable constitutional claim. As a matter of state tort law, it may be that "the least touching of another in anger is a battery," but that does not make it "a violation of a constitutional right actionable under 42 U.S.C. § 1983." *Riley*, 115 F.3d at 1167 (internal quotation marks omitted). The point of the *de minimis* rule is to make it clear that the Constitution does not become a "font of tort law" that the federal courts "superimpose[] upon whatever systems" the States already have. *Paul v. Davis*, 424 U.S. 693, 701 (1976). Otherwise, every minor touching would become actionable, blurring the lines between the state courts' enforcement of their tort laws and the federal courts' enforcement of the Constitution. Whatever else non-actionable *de minimis* force may be, it must include a touching that neither "hurt" nor threatened the individual.

III.

For these reasons, we reverse the denial of qualified immunity as to McGuckin, but we affirm as to Stone and remand for further proceedings.

---

**DISSENT**

---

CLAY, Circuit Judge, dissenting.  Shaun Leary was repeatedly brutalized while a pretrial detainee at the Livingston County Jail at the hands of guards and inmates alike.  On appeal, the two guards that played a central role in this brutalization, Defendants Scott Stone and Denis McGuckin, challenge the district court's denial of qualified immunity with respect to Plaintiff's claims of deliberate indifference and excessive use of force.  Each of the challenges raised by Defendants should be rejected by this Court.  With respect to Defendant Stone, it is clear from the briefs filed in the instant appeal that he has not presented a legal question over which this Court has jurisdiction and therefore his appeal must be dismissed.  With respect to Defendant McGuckin, this Court should find that the district court properly denied qualified immunity inasmuch as McGuckin sought to intentionally inflict both physical and psychological harm upon Plaintiff through the arbitrary use of force, which was more than *de minimis*, in violation of the Fourteenth Amendment.  Because the majority reaches conclusions to the contrary, I respectfully dissent.

**BACKGROUND**

The lawsuit at issue stems from an assault on Plaintiff, Shaun Leary, while he was a pretrial detainee at the Livingston County Jail.  When reviewing a denial of qualified immunity, this Court must view the facts in the light most favorable to Plaintiff, and therefore I will present them accordingly.

On February 11, 2000, Plaintiff was arrested on charges of criminal sexual conduct in the first and second degree.  The complainant and alleged victim of the criminal charge was a nine year-old-girl.  After his arrest, Plaintiff was transported to the Livingston County Jail.

At approximately 1:30 a.m. on Saturday, February 12, 2000, Plaintiff was processed into the jail by two officers, Scott Stone and Denis McGuckin. While being processed for intake, Officer McGuckin allegedly harassed Plaintiff, calling him a "sick bastard" and throwing arraignment paperwork in his face. (J.A. at 385, 652)  During this process, Officer Stone warned Plaintiff that other inmates would express similar disapproval of his charges and that he would likely be a target of physical assault given the allegations of child molestation.  Indeed, Stone admitted in a written statement that he told Plaintiff that "once other inmates found out what he did that there would be no protection from anyone here at the jail." (J.A. at 391, 848) Officer McGuckin also admonished Plaintiff to "keep his mouth shut about his charges . . . for his own safety." (J.A. at 696, 431, 448)

Another inmate, Richard Kimmel, was also "deloused" for intake purposes at the same time as Plaintiff.  While escorting inmate Kimmel to a minimum security cell after processing, Officer Stone told him that "the guy he was deloused with was in for raping a nine year old girl." (J.A. at 847)

Upon completion of Plaintiff's processing, Stone and McGuckin escorted Plaintiff to cell 127 N in the medium security wing of the jail.  Prior to reaching the cell, McGuckin instructed Plaintiff to retrieve a bin containing his bedding materials, a towel and a laundry bag.  As Plaintiff picked up his materials, he alleges that McGuckin struck him on the back of the neck, causing him to drop his bin.  Plaintiff described the blow as a "karate chop." (J.A. at 640)  Although it is unclear how much force was used, Plaintiff analogized the amount of force to "the way a woman hits a man," (J.A. at 654), and alleges that he suffered as a result of the strike.

After escorting Plaintiff to his cell, Officer Stone was charged with monitoring the medium and maximum security wings of the jail. Thereafter, one inmate, Eric Riley, initiated contact with Officer Stone via intercom to request permission to leave his cell to obtain medication. While the intercom was still active, Officer Stone communicated with Ross Hinchey, the other inmate occupying the cell. Hinchey was known as the "Rock Boss"[1] of the medium security area. Officer Stone told Hinchey that the "new guy in N" was "in for raping a nine year old girl." (J.A. at 850) This statement was corroborated by a number of inmates including Eric Riley and Sandy Glover, both of whom describe overhearing Officer Stone's disclosure of Plaintiff's charges.

On Saturday, while all inmates were on "lock down," Glover and other inmates began verbally harassing Plaintiff. By Sunday, February 12, 2000, the harassment by inmates intensified as Plaintiff was called a "baby raper" and a "bitch." (J.A. at 403)  At approximately 6:15 p.m., Plaintiff left his cell to call home, seeking his family's help in getting transferred out of the jail because "the other inmates were out to get him and they were going to kill him." (J.A. at 636) While standing by the phone, Plaintiff was pulled over a nearby rail from behind by Glover and choked, punched and kicked by several inmates until unconscious. He lay battered and bloody on the jailhouse floor until another inmate came to his aid and escorted him to officers for medical attention. Following the assault, Plaintiff was transported to McPherson Hospital Emergency Room and admitted to St. Joseph's Hospital for treatment. As a result of the assault, Plaintiff suffered a facial fracture and a fractured nose, which required corrective surgery.

Following the assault, the Livingston County Sheriff's Department launched an internal criminal investigation. Several inmates were interviewed as part of the investigation. While the investigation centered on ascertaining the criminal culpability of inmates involved in the assault, Officers McGuckin and Stone were implicated due to allegations of McGuckin's use of force as well as Stone's role in informing the inmate population of Plaintiff's charges. No charges, however, were filed against either officer.

Plaintiff later brought suit under 42 U.S.C. § 1983 against Livingston County, the Livingston County Sheriff and a number of individual officers including Stone and McGuckin. *Leary v. Livingston County*, No. 03-60021, 2006 WL 2865213, at *1 (E.D. Mich. 2006). With respect to Officer McGuckin, Plaintiff alleged deliberate indifference and excessive use of force in violation of the Fourth, Fifth, Eighth and Fourteenth Amendments. *Id.* With respect to Officer Stone, Plaintiff alleged that his conduct constituted deliberate indifference in violation of the Eighth and Fourteenth Amendments. *Id.* All Defendants moved for summary judgment. *Id.* In particular, Defendants McGuckin and Stone argued that they were entitled to qualified immunity. The district court granted Officer McGuckin's motion for summary judgment with respect to deliberate indifference but denied summary judgment with respect to Plaintiff's allegation of excessive force. *Id.* at *6. The district court found that there was a genuine dispute of material fact as to whether McGuckin used force maliciously and sadistically for the purpose of causing harm in violation of the Fourteenth Amendment as analogized to the standards of the Eighth Amendment. In addition, the district court concluded that Officer Stone was not entitled to qualified immunity with respect to Plaintiff's deliberate indifference claim. *Id.* at *7. In particular, the district court determined that there was a triable issue of material fact with respect to whether Stone recklessly disregarded a substantial risk of harm to Plaintiff when he told other inmates about Plaintiff's charges. Defendants Stone and McGuckin now timely appeal.

---

[1] According to deposition transcripts, a "Rock Boss" is an inmate who is "in charge" of his area within the jail. (J.A. at 754)

## DISCUSSION

### I.     Jurisdiction to Hear Defendant Stone's Qualified  Immunity Appeal

Although the majority understandably wants to reach the merits of Stone's qualified immunity appeal given the unpleasant factual circumstances of this case, unfortunately the issues raised by Stone fall outside of the narrow jurisdictional authority of this Court.  Throughout Stone's brief to this Court, he repeatedly challenges the factual findings made by the district court in its denial of qualified immunity.  On review of the district court's qualified immunity determination, we are bound by the jurisdictional confines of the "collateral order" doctrine and may reach only those appeals that present pure questions of law.  In short, this Court cannot reach the factual disputes that Stone invites this Court to resolve on appeal. Thus, contrary to the majority's determination, Stone's appeal should be dismissed for lack of jurisdiction.

While most denials of summary judgment are nonfinal orders which cannot be appealed under 28 U.S.C. § 1291, it is well established that an order denying qualified immunity is immediately appealable. *See*, *e.g*., *Mitchell v. Forsyth*, 472 U.S. 511, 525-27 (1985).  In *Mitchell v. Forsyth*, the Supreme Court held that this Court has jurisdiction to hear an interlocutory appeal taken from a denial of qualified immunity pursuant to the "collateral order" doctrine under § 1291.  *Id.* at 525-27.  Under this doctrine, the immediate review of a qualified immunity determination is based on the fact that "the qualified immunity defense exists partly to protect officials from having to stand trial; a defendant wrongly forced to go to trial loses the benefit of the immunity even if he or she is exonerated after trial; therefore, the order cannot effectively be reviewed after trial and is considered final."  *Phelps v. Coy*, 286 F.3d 295, 298 (6th Cir. 2002).

This Court's jurisdiction regarding orders denying qualified immunity, however, is narrow. This Court may exercise jurisdiction "only to the extent that a summary judgment order denies qualified immunity based on a pure issue of law."  *Gregory v. City of Louisville*, 444 F.3d 725, 742 (6th Cir. 2006).  Indeed, "[a] defendant, entitled to invoke a qualified immunity defense, may not appeal a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of material fact for trial." *Johnson v. Jones*, 515 U.S. 304, 319-20 (1995).  Rather, "the defendant must be prepared to overlook any factual dispute and to concede an interpretation of the facts in the light most favorable to the plaintiff's case." *Berryman v. Rieger*, 150 F.3d 561, 562 (6th Cir. 1998); *see also Booher v. Northern Kentucky Univ. Bd. of Regents*, 163 F.3d 395, 396-97 (6th Cir. 1999).  Thus, to the extent that the denial of qualified immunity is based on a factual dispute, such a denial falls outside of the narrow jurisdiction of this Court.  *Berryman*, 150 F.3d at 563; *Gregory*, 444 F.3d at 742 ("To be clear, an appellant's contention that the district court erred in finding a genuine issue of fact for trial is not the type of legal question which we may entertain on an interlocutory basis.").

As the majority correctly notes, a § 1983 claimant alleging deliberate indifference must meet objective and subjective requirements in order to establish a constitutional violation.  *See Farmer v. Brennan*, 511 U.S. 825, 833 (1970).  First, the failure to protect from risk of harm must be objectively, "sufficiently serious."  *Id.*  To meet this requirement, Plaintiff must show that "he is incarcerated under conditions posing a substantial risk of serious harm."  *Id.*  Second, to satisfy the subjective requirement, Plaintiff must show "more than ordinary lack of due care for the prisoner's interests or safety."  *Id.* at 835.  Instead, the subjective requirement is met where a plaintiff demonstrates that prison officials acted with "deliberate indifference" to a substantial risk of harm. An official is deliberately indifferent where "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference."  *Id.* at 837.

In his briefing to this Court, instead of contesting whether the facts as alleged by Plaintiff constitute a constitutional violation, Defendant Stone factually disputes Plaintiff's proof regarding the subjective prong of the deliberate indifference inquiry–that is, whether he was aware of and disregarded a substantial risk of harm to Plaintiff. For example, Defendant Stone argues that he was not aware that other inmates would pose a threat to Plaintiff because of the nature of his charges. Rather, he asserts that he mentioned Plaintiff's charges to one inmate out of a sense of "wonderment." (Stone Br. at 24) However, in denying summary judgment, the district court found a genuine issue of material fact regarding Defendant Stone's knowledge of the risk of harm to Plaintiff. Indeed, the district court noted that Stone's awareness of a substantial risk of harm was "evidenced by Stone's admission that 'once the other inmates found out what he did that there would be no protection from anyone here at the jail.'" *Leary*, 2006 WL 2865213, at *9. In short, Stone impermissibly disputes the facts that, if credited, support a finding that he was aware of a substantial risk of harm to Plaintiff.

Moreover, Stone suggests that there was no evidence that he facilitated or encouraged an attack on Plaintiff–that is, whether he disregarded a substantial risk of harm to Plaintiff. Instead, Defendant Stone maintains that he did not mention Plaintiff's charges to more than one person housed at the jail. Rather, Stone argues that another inmate, Ross Hinchey, did not hear his comments over the intercom regarding Plaintiff's rape charges because the inmate was sleeping.

Again, the evidence presented to and considered by the district court at summary judgment contradicts Stone's assertions. The district court considered an interview with Hinchey where he stated that he did in fact hear Stone's comment regarding Plaintiff's charges over the intercom. Based on this evidence, the district court found that there was a genuine dispute of material fact regarding the number of people who learned of Plaintiff's charges from Stone. Taking all inferences in favor of Plaintiff, the district court found sufficient evidence that Stone recklessly disregarded a risk of harm to Plaintiff when he told at least two inmates of Plaintiff's charges.

Additionally, this Court is also without jurisdiction to review Defendant Stone's assertion that Plaintiff's right to be free from a substantial risk of harm was not clearly established. In his appellate brief, Stone does not present a developed legal argument, but instead merely sets forth the legal standard for qualified immunity. He does not suggest how such a standard is applicable to him and has thus waived the argument. "It is a 'settled appellate rule that issues averred to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.'" *Spirko v. Mitchell*, 368 F.3d 603, 612 (6th Cir. 2004) (quoting *United States v. Elder*, 90 F.3d 1110, 1118 (6th Cir. 1996)).

In essence, Defendant Stone does not dispute the deliberate indifference theory advanced by Plaintiff. Although he states that Plaintiff has not proven a violation of a clearly established right, in substance what Stone actually presents is a factual argument regarding his awareness and disregard of a substantial risk of harm to Plaintiff. This sort of argument, based upon disputes of fact, is inappropriate for review on appeal of a denial of qualified immunity.

## II.     Defendant McGuckin and Plaintiff's Excessive Force Claim

Although Defendant Stone's appeal should be dismissed, the majority properly reaches the merits of Defendant McGuckin's appeal regarding the denial of qualified immunity with respect to Plaintiff's excessive force claim. As discussed below, however, the majority erroneously concludes that McGuckin is entitled to qualified immunity despite the fact that McGuckin, through his use of force, intended to terrorize, punish and harass Plaintiff because of his charges. Contrary to the majority's determination, McGuckin's actions were more than *de minimis* and constituted excessive

force in violation of Plaintiff's Fourteenth Amendment rights.  Therefore, McGuckin is not entitled to qualified immunity and the district court should be affirmed.

"Qualified or 'good faith' immunity is an affirmative defense that must be pleaded by a defendant official."  *Harlow v. Fitzgerald*, 457 U.S. 800, 814 (1982).  This defense allows a government official to invoke "an entitlement not to stand trial or face the other burdens of litigation."  *Saucier v. Katz*, 533 U.S. 194, 200 (2001).  To determine whether qualified immunity was properly denied, this Court must examine: (1) whether, considering the evidence in the light most favorable to the party injured, a constitutional right has been violated, and (2) whether that right was clearly established.  *Estate of Carter v. City of Detroit*, 408 F.3d 305, 310-11 (6th Cir. 2005) (citing *Saucier*, 533 U.S. at 201); *Comstock v. McCrary*, 273 F.3d 693, 701 (6th Cir. 2001).

### A.          *Source of Plaintiff's Constitutional Right to Be Free from Excessive Force*

In evaluating whether qualified immunity was properly denied, the constitutional right alleged to have been infringed upon must first be ascertained. *Graham v. Conner*, 109 S.Ct. 1865, 1870 (1989).  In *Graham v. Conner*, the Supreme Court noted that there is no generic standard for excessive force claims brought under § 1983.  Instead, courts were directed to begin the analysis of § 1983 excessive force claims by "identifying the specific constitutional right allegedly infringed by the challenged application of force."  *Id.*  The specific constitutional provision to be applied to the challenged application of force turns largely on the status of the plaintiff at the time of the alleged use of excessive force.  "In most instances, that will be either  the Fourth Amendment's prohibition against unreasonable seizures of the person, or the Eighth Amendment's ban on cruel and unusual punishments, which are the two primary sources of constitutional protection against physically abusive governmental conduct."  *Id.* at 1870-71.   The determination of the proper application of one amendment or another "is not merely academic, for the standards of liability vary significantly according to which amendment applies."  *Phelps v. Coy*, 286 F.3d 295, 299 (6th Cir. 2002).

At the time of the alleged assault, Plaintiff was a pretrial detainee at the Livingston County Jail.  A pretrial detainee is a person who has been "lawfully committed to pretrial detention [and] has not been adjudged guilty of any crime.  He has only a judicial determination of probable cause as a prerequisite to [the] extended restraint of [his] liberty following arrest." *Bell v. Wolfish*, 441 U.S. 520, 536 (1979) (internal citations and quotations omitted).  As the Supreme Court noted in *Bell v. Wolfish*, pretrial detainees "legitimately may be incarcerated by the Government prior to a determination of their guilt or innocence."  441 U.S. at 523.

Notwithstanding the government's legitimate incarceration of pretrial detainees, the Supreme Court has held that "under the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law."  *Id.* at 535.  Thus, because a pretrial detainee has not yet been convicted, the source of a pretrial detainee's right to be free from excessive force stems from the Fourteenth Amendment rather than the Eighth Amendment.  Under the Fourteenth Amendment's Due Process Clause, the proper inquiry is whether the challenged action "amounts to punishment of the detainee." *Id*.  As the Court noted in *Wolfish*, "[a] sentenced inmate, on the other hand, may be punished, although that punishment may not be 'cruel and unusual' under the Eighth Amendment."  441 U.S. at 536 n.16; *see also Whitley v. Albers*, 475 U.S. 312,  318 (1986) (noting that the Eighth Amendment's Cruel and Unusual Punishments Clause "was designed to protect those convicted of crimes, and consequently, the Clause applies only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions").  In other words, unlike the post-conviction context, substantive due process prohibits government action that seeks to bestow retribution or punishment upon pretrial detainees. *Wolfish*, 441 U.S. at 540 n.20.

Although the rule announced in *Bell v. Wolfish* concerned conditions of confinement, the Court has made clear that substantive due process extends not only to such conditions but also to claims of excessive force made by pretrial detainees. As the Supreme Court noted in *Graham*, "[i]t is clear . . . that the Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment." 109 S.Ct. at 1871 n.10 (citing *Wolfish*, 441 U.S. at 535-539; *see also Block v. Rutherford*, 468 U.S. 576, 584 (1984).

In evaluating excessive force claims made by pretrial detainees, this Court has adopted the due process rationale announced in *Bell v. Wolfish*. *See Gantt v. Akron Corrections Facility*, No. 95-3147, 1996 WL 6530 (6th Cir. 1996) (unpublished); *Phelps*, 286 F.3d at 301; *United States v. Budd*, 496 F.3d 517, 529 (6th Cir. 2007). Thus, in the instant case, Plaintiff's excessive force claim is governed by the Fourteenth Amendment, which presents an inquiry distinct from the heightened showing required to establish a violation of the Cruel and Unusual Punishments Clause of the Eighth Amendment.

### B. Fourteenth Amendment As Applied to Plaintiff's Excessive Force Claim

As noted above, the Due Process Clause of the Fourteenth Amendment "protects a pretrial detainee from the use of excessive force that amounts to punishment." *Graham*, 109 S.Ct. at 1871 n.10 (citing *Wolfish*, 441 U.S. at 535-36). To determine whether a constitutional violation has occurred, "[a] court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose." *Id.* at 538. Because jails are often dangerous and the "maintenance of prison security and discipline may often require that prisoners be subjected to physical contact which at common law would be actionable as an assault or battery and which, in retrospect, may have been excessive," *Parrish v. Johnson*, 800 F.2d 600, 604 (6th Cir. 1986), courts must examine the totality of the circumstances to determine whether a particular governmental action was violative of a detainee's Fourteenth Amendment rights while giving due deference to the judgments of correctional officers. *Wolfish*, 441 U.S. at 538-39.

The examination of the totality of the circumstances includes an inquiry into the alleged perpetrator's state of mind. *Graham*, 109 S. Ct. at 1873 (noting that the term "punishment" "clearly suggest[s] some inquiry into subjective state of mind . . . ."). The absence of a clear intent to punish, however, is not fatal to a detainee's § 1983 excessive force claim. Rather, "[a]bsent a showing of an express intent to punish on the part of detention facility officials, that determination generally will turn on whether an alternative purpose to which [the use of force] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned to it." *Wolfish*, 441 U.S. at 538-39. An intent to punish a pretrial detainee may be inferred from the use of force in the absence of any penological justification. *See Wolfish*, 441 U.S. at 539 ("[I]f a restriction or condition is not reasonably related to a legitimate goal–if it is arbitrary or purposeless–a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees."). When examining claims of excessive force, however, courts must be mindful that "[t]here is, of course, a *de minimis* level of imposition with which the Constitution is not concerned." *Wolfish*, 441 U.S. at 539 n.21 (quoting *Ingraham v. Wright*, 430 U.S. 651, 674 (1977)).

When viewing the facts in the light most favorable to the Plaintiff, as the majority seems unwilling to do, it is clear that there is a genuine issue of material fact regarding whether McGuckin's actions were intended to punish Plaintiff because of the nature of the charge for which he was detained. The "karate chop" at issue was preceded by McGuckin's initial harassment of Plaintiff wherein he called Plaintiff a "sick bastard." Moreover, the "karate chop" served no legitimate penological objective inasmuch as Plaintiff was compliant with the orders given to him. Indeed, Plaintiff was not resisting the orders of either McGuckin or Stone, and in fact was bending down to comply with McGuckin's order that he retrieve his bedding materials. Clearly, Plaintiff

posed no threat to the safety of McGuckin or others. Taken together, Defendant McGuckin's harassment and the fact that Plaintiff posed no threat to officers or other detainees demonstrates that McGuckin's conduct was not designed to advance penological objectives but rather to punish Plaintiff.

The majority, however, finds that Plaintiff cannot establish a constitutional violation. Although the majority does not dispute that McGuckin intended to punish Plaintiff, apparently it believes that the use of force was not excessive enough for recovery under § 1983. The majority concludes that McGuckin's use of force was *de minimis*, and therefore not violative of the Fourteenth Amendment, because Plaintiff suffered no ascertainable physical injury. Although the use of force must be more than *de minimis* to establish a cognizable claim of excessive force, whether a plaintiff suffered significant pain or injury is not dispositive. *Hardy v. Vieta*, 174 F. App'x 923, 926 (6th Cir. 2006) (unpublished) ("[W]hether force is *de minimis* does not depend on the extent of the prisoner's injury."). Indeed, the question of injury may be probative of the amount of force used but is not itself required to sustain a constitutional claim. As the Supreme Court noted in *Hudson v. McMillian*, 503 U.S. 1, 7 (1992), "the extent of an injury suffered by an inmate is one factor that may suggest whether the use of force could plausibly have been thought necessary in a particular situation . . . ." *See also id.* ("The absence of serious injury is . . . relevant to the Eighth Amendment inquiry, but does not end it."). Even in the context of the Eighth Amendment, as noted by the *Hudson* court, "[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency are always violated. This is true whether or not significant injury is evident." *Id.* at 8.

Relying on *Hudson*, this Court has found uses of force to be more than *de minimis,* despite the fact that the plaintiff suffered no physical injuries, where such force exacts psychological harm and produces an environment of fear of arbitrary violence at the hands of guards. *See Pelfrey v. Chambers*, 43 F.3d 1034, 1037 (6th Cir. 1995); *Hardy*, 174 F. App'x at 926. For example, in *Pelfrey v. Chambers*, an excessive force case arising under the Eighth Amendment, an officer allegedly assaulted a plaintiff-inmate by pulling out a knife, and cutting the plaintiff's hair, while another officer held the plaintiff's hands behind his back. 43 F.3d at 1035. After the assault, the officers "stood there grinning and smiling." *Id.* The plaintiff stated that "these officers had me scared, intimidated, and threatened." *Id.* In examining the circumstances surrounding the alleged constitutional violation, we found that the officer's actions "were designed to frighten and degrade [the plaintiff] by reinforcing the fact that his continued well being was entirely dependent on the good humor of his armed guards." *Id.* at 1037. Based on this psychological harm, the *Pelfrey* court found that the plaintiff stated a cognizable constitutional claim of excessive force which was more than *de minimis*, notwithstanding the fact that he suffered no physical injury or pain.

In *Pelfrey*, we cited *Parrish v. Johnson*, 800 F.2d 600 (6th Cir. 1986), with approval to support the conclusion that a plaintiff may establish a cognizable constitutional claim of excessive force where the aim of such force was to harass, intimidate or terrorize. In *Parrish*, this Court found qualified immunity to be inappropriate where a prison guard repeatedly taunted a paraplegic prisoner with a knife and failed to communicate the prisoner's requests for medical care to nurses. The *Parrish* court noted that the defendant's actions were "devoid of logic or reason," and absent any "legitimate penological or institutional objective." *Id.* at 605. The defendant, we noted, "acted to strip [the plaintiff] of his dignity." *Id.* Based on this conduct and its psychological effects on the plaintiff, we found that the plaintiff presented sufficient evidence of an Eighth Amendment violation. *Id.*

Similarly, in *Hardy v. Vieta*, 174 F. App'x 923 (6th Cir. 2006), the plaintiff alleged that a prison guard assaulted him in violation of the Eighth Amendment. There, the plaintiff alleged that the defendant entered his cell and told another inmate that he intended to harm the plaintiff. *Id.* at 924. The plaintiff alleged that the defendant pushed a steel door onto him, smashing him between

the steel door and a brick wall. The plaintiff alleged that he suffered injuries to his arm and lower back as a result of the assault. *Id.* Despite the fact that the plaintiff had "no recorded objective injuries," we found that summary judgment was inappropriate. *Id.* at 925. We rejected the defendant's contention that the use of force was *de minimis*, noting that "whether the use of force is *de minimis* does not depend on the extent of the prisoner's injury." *Id.* (citing *Hudson*, 503 U.S. at 9-10). Instead, this Court found that the use of force was more than *de minimis*. *Id.* at 926. We reached this conclusion, in part, based on the intentional and premeditated nature of the force and the "unreasonable threat of injury" produced by such force. *Id.*

Although the aforementioned cases were based on the Eighth Amendment, their wisdom with respect to what constitutes more than a *de minimis* use of force is equally applicable in the Fourteenth Amendment context. Indeed, it would be quite incongruous for an individual convicted of a crime to have greater protections than one who is merely being held pending a determination of guilt or innocence. Thus, *Pelfrey*, *Parrish* and *Hardy* support the proposition that non-physical injuries and the effects of intentional use of force are sufficient to establish a cognizable claim of excessive use of force that is more than *de minimis*.

The majority, however, reads *Pelfrey* and *Hardy* far too narrowly to reach the opposite conclusion. For example, the majority suggests that the use of force in *Pelfrey* was of a different "degree and nature" because the defendant grabbed the plaintiff, held him down while cutting his hair and grinned and laughed. Based on these factual differences, the majority concludes that *Pelfrey* does not support Plaintiff's claim. The attempt to distinguish *Pelfrey*, however, is disingenuous and lacks a principled basis. In both this case and in *Pelfrey*, neither claimant alleged serious injury or even suggested that the use of force resulted in any physical pain. In both this case and in *Pelfrey,* the constitutional violation was based on the psychological effects of the use of force.

Moreover, the majority suggests that *Hardy* is inapposite because the level of force used by the defendant was greater than the "karate chop" at issue here. Once again, the majority misrepresents the holding of that case in an attempt to limit the protections available under the Fourteenth Amendment. Contrary to the majority's characterization of the case, the *Hardy* court was clear in finding that the "unreasonable threat of injury" could support a constitutional claim. Thus, both *Pelfrey* and *Hardy* support the district court's finding that McGuckin's use of force was more than *de minimis*.

Under the majority's reading of the caselaw outlining the boundaries of permissible uses of force in institutional settings, however, the government and its officials are permitted to engage in uses of force designed to psychologically harm a detainee so long as they do not impose some arbitrary quantum of physical pain. Such a rule is particularly disturbing given the current climate of detainee abuse as well as the evolving techniques of punishment and interrogation that will easily pass this test, while inflicting untold damage upon detainees and prisoners alike. Such a rule cannot stand. *Cf. Estelle v. Gamble*, 429 U.S. 97, 102 (1976) (noting that torture and barbarous punishment was the "primary concern of the drafters" of the Eighth Amendment). Rather, the better rule, as announced in *Pelfrey*, *Parrish* and *Hardy*, wherein psychological injury due to intentional use of force designed to punish a detainee may support a claim of excessive use of force, adequately protects detainees while preserving the prerogatives of correctional institutions.

Applying this rule to the instant case, it is clear that McGuckin's use of force was more than *de minimis*. McGuckin took it upon himself to determine that Plaintiff should be "punished" for his alleged crime and "karate chopped" him while he was essentially defenseless. That Plaintiff was not injured was merely fortuitous inasmuch as McGuckin intentionally and maliciously struck him on the neck. The effect of the use of force, however, hit the mark, as in *Pelfrey*, because the force "frighten[ed] and degrade[d] [Plaintiff] by reinforcing the fact that his continued well being was

entirely dependent on the good humor of his armed guards." 43 F.3d at 1037; *see also Hardy*, 174 F. App'x at 926. Indeed, Plaintiff alleges in his complaint that he suffered as a result of McGuckin's use of force. Whether he was physically hurt is inapposite. Consequently, when viewing the facts in the light most favorable to Plaintiff, like *Pelfrey*, *Parrish* and *Hardy*, it cannot be said that McGuckin's flagrant assault on Plaintiff was *de minimis* or constitutionally insignificant. Plaintiff, therefore, is entitled to have his excessive force claim heard by a jury and to have the ability to make his case for damages, even if nominal. *See Carey v. Piphus*, 435 U.S. 247, 264 (1978) (approving nominal damages for the "mental and emotion distress caused by the denial of due process," although no actual injury was proven); *see also Pembaur v. City of Cincinnati*, 882 F.2d 1101, 1104 (6th Cir. 1989) (noting that nominal damages are appropriate for claims where the only proof of emotional injury was plaintiff's claim that he was "highly upset"). To hold otherwise "would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury." *Hudson*, 503 U.S. at 9. Indeed, the majority's rationale may have the untoward consequence of encouraging the use of psychological torture in some instances where physical injury may be *de minimis*.

## CONCLUSION

For the reasons set forth above, I would dismiss Defendant Stone's qualified immunity appeal regarding Plaintiff's claim of deliberate indifference under 42 U.S.C. § 1983, and deny qualified immunity to Defendant McGuckin regarding Plaintiff's excessive force claim.