NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 15a0477n.06

No. 13-2137

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Jun 29, 2015
DEBORAH S. HUNT, Clerk

SHERMAN O. WAGNER,               )
                                 )
      Petitioner-Appellant,      )
                                 )
v.                               )          ON APPEAL FROM THE
                                 )          UNITED STATES DISTRICT
                                 )          COURT FOR THE EASTERN
PAUL KLEE,                       )          DISTRICT OF MICHIGAN
                                 )
      Respondent-Appellee.       )
                                 )

Before: BOGGS and KETHLEDGE, Circuit Judges; BLACK, District Judge.[*]

KETHLEDGE, Circuit Judge. Sherman Wagner was convicted of murder in Michigan state court thirteen years ago. He later filed a habeas petition, arguing primarily that the prosecutor violated his due-process rights when she asked him improper questions and allowed a witness to lie on the stand. Wagner also argued that his lawyers were constitutionally ineffective at trial and on appeal. The district court denied the petition. We affirm.

I.

In March 2000, Kiley Moss and Thelyus Johnson took a Greyhound bus from Lansing to Detroit to buy drugs. There they met up with Antonio Edwards, who said he knew where they could purchase cocaine. R. 11-2 at 449. The three men went to a drug house. Moss and Johnson went into a back room to weigh the drugs; Edwards stayed behind.

---

[*] The Honorable Timothy S. Black, United States District Judge for the Southern District of Ohio, sitting by designation.

Then two other men entered the back room. One of them pointed a revolver at Moss and Johnson, said "you know what time it is," and shot both at point-blank range. R. 11-2 at 462-63. Moss immediately collapsed, but Johnson remained standing despite bullet wounds in his shoulder and lower back. The gunman asked Johnson "where the money at, bitch," and Johnson handed over what cash he had. R. 11-2 at 464. After the gunman demanded more, Johnson surrendered his two rings. R. 11-3 at 465. Johnson then "played like [he] was dead so they wouldn't shoot [him] no more." R. 11-3 at 466. The gambit paid off; Johnson escaped. Someone (probably one of the two robbers) set fire to the house, which burned to the ground. The police found Moss's body in the burnt-out remains. Johnson later gave the police a description of the shooter that matched Wagner, and picked Wagner out of a 12-man lineup.

Wagner was indicted for Moss's murder and related charges. At trial, Johnson again identified Wagner as the shooter, repeatedly testifying that he was "positive" that Wagner was the man who shot him. R. 11-2 at 463-64; 11-3 at 477-78, 524-35, 527. Edwards had not seen the shooting himself, but testified that he had seen Wagner go in the back room just before the shots rang out. On cross-examination, Wagner's lawyer questioned Edwards about his relationship with Wagner:

Q: How long had you known [Wagner]?

A: About nine or eight months before the shooting happened.

Q: About nine or eight months before the shooting happened[?]

A: Yes.

Q: And you're sure of that.

A:Yes. . . .

Q: June or August. [You met Wagner] [s]ometime in the summer of the year, 1999, correct?

A: Yes.

Q: That's when you first met [Wagner].

A: Yes.

Q: You're sure about that.

A: Yes, positive.

Q: You're not lying about that.

A: No.

R. 12-2 at 686. As it turned out, Edwards was indeed lying about that. Wagner had been in prison from August 1996 until February 2000—and Edwards had been free—so the two men could not have met during the summer of 1999.

Edwards also testified that he had seen the police arrest Wagner at the drug house three days before the shooting. Wagner's lawyer asked Edwards whether he was sure about that; Edwards said he was. R. 12-2 at 711. But that testimony likewise turned out to be false: the police had actually arrested Wagner's younger brother, not Wagner himself. R. 13 at 875.

After the prosecution rested, Wagner took the stand. His lawyer asked him on direct examination whether he had ever been arrested for a violent crime. Wagner replied "[n]o sir. Only thing I've ever been arrested or convicted—I mean the only thing I've ever did [any] jail time, convicted for, ever, was stolen cars, ever." R. 13-3 at 817. Wagner also testified that his real first name was Bobby, not Sherman. Wagner said that Sherman Wagner was his younger brother—who went by the nickname "Cat"—and that Cat must have committed the murder.

When the prosecutor stood up to cross-examine Wagner, she immediately impeached him for making these statements on direct. She first clarified that Wagner had indeed been arrested for violent crimes, including homicide. R. 13-3 at 823. She then went on to explore the details

of those arrests, forcing Wagner to admit that on those occasions he had used various false names, including both "Sherman" and "Cat." (It is unclear, even now, what Wagner's real first name is.)

The jury convicted Wagner of first-degree murder and other charges, and the judge sentenced him to life in prison. After exhausting his state-court remedies, Wagner filed a federal habeas petition, which the district court denied. This appeal followed.

## II.

We review the district court's decision de novo. *Mendoza v. Berghuis*, 544 F.3d 650 (6th Cir. 2008). The Michigan state courts adjudicated on the merits all of the claims that Wagner raises now. Thus, to obtain habeas relief, Wagner must show that the state courts' "adjudication of [his claims] resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Wagner does not argue that the state courts reached a decision "contrary to" Supreme Court precedent, so he must show that the state courts' "application of clearly established [Supreme Court] law" was "objectively unreasonable." *Williams v. Taylor*, 529 U.S. 362, 409 (2000). The question is thus whether "fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." *Harrington v. Richter*, 562 U.S. 86, 102 (2011).

## A.

Wagner argues that he is entitled to habeas relief because the prosecutor asked him improper questions on two occasions. First, he argues that the prosecutor should not have asked him about prior bad acts, namely his homicide arrests. To prevail, Wagner must show that these questions violated his constitutional rights as defined by the Supreme Court of the United States.

28 U.S.C. § 2254. He cannot make that showing: although Federal Rule of Evidence 404(b) generally bars a federal prosecutor from asking a defendant about prior bad acts, the Supreme Court has never held that the Constitution forbids a prosecutor from doing so. *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). Thus, the Michigan courts did not unreasonably apply any holding of the Supreme Court when they rejected Wagner's claim.

Second, Wagner argues that the prosecutor should not have asked him whether he could still be charged for the murder of a man named Kamal Logan. R. 13-3 at 838. Those questions were indeed improper, since they were both irrelevant and prejudicial. To show a due-process violation, however, Wagner must show that the prosecutor's misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). A fairminded jurist could hold that the prosecutor's three improper questions about Logan's murder did not rise to that level. Wagner is therefore not entitled to habeas relief on the ground that the prosecutor questioned him on these two subjects.

B.

Wagner argues that the prosecutor violated his due-process rights when she allowed Edwards to give false testimony. In *Giglio v. United States*, the Supreme Court made clear that a prosecutor may not knowingly elicit false testimony or "allow[] it to go uncorrected when it appears." 405 U.S. 150, 153 (1972). But the Court also held that, to show a due-process violation, a defendant must show that the false testimony was material, *i.e.*, that it could "in any reasonable likelihood have affected the judgment of the jury." *Id.* at 154.

Here, Edwards testified on cross-examination that he had met Wagner in the summer of 1999 and had seen the police arrest Wagner three days before the shooting. R. 12-2 at 686, 711.

Neither statement was true. Although the prosecutor did not elicit those statements—Wagner's attorney did—she allowed them to go uncorrected, at least for a while. By the end of trial, however, the jurors were well aware that Edwards had lied; defense counsel himself made that point during closing arguments. R. 14 at 1053-54. Fairminded jurists could therefore agree with the Michigan courts that Edwards's false testimony was not material to the verdict, which means the state courts reasonably applied *Giglio* when they rejected Wagner's claim. Thus, Wagner is not entitled to habeas relief on this ground.

C.

Wagner argues that his lawyer was constitutionally ineffective at trial. To prevail on this claim, Wagner must show both that his counsel's performance was "professionally unreasonable" and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 691, 694 (1984).

Wagner argues that his attorney was ineffective in three ways. First, Wagner contends that his attorney should not have waited until closing arguments to point out that Edwards had lied on the stand. But ambush is often wiser than frontal assault; and ambush is what defense counsel had in mind here. During cross-examination, counsel drew Edwards into the trap, as it were, forcing him to confirm again and again that he was "sure" that he had met Wagner in the summer of 1999 and that he had seen Wagner arrested three days before the shooting. Then came the enfilade: during closing arguments, defense counsel demonstrated that neither of the things Wagner was "sure" of were in fact possible; and counsel thus argued, powerfully, that one of the prosecution's only two eyewitnesses had committed perjury on the stand. Counsel's tactics here were literally textbook. *See* Gitchel & O'Brien, *Trial Advocacy Basics* 135 (2006)

("[F]orce the witness to concede all of the underlying facts that justify a conclusion, but refrain from mentioning the conclusion that flows from those facts until closing argument").

Second, Wagner argues that his lawyer was constitutionally ineffective when he argued during closing that, if Wagner were the real shooter, he would have ensured that Johnson was dead before leaving the drug house. But Wagner himself said as much on direct examination, stating that he had "watched people do life [in prison] for leavin' people alive. If I'm gonna go in there and attempt to kill somebody, you better believe they're gonna die." R. 13-4 at 919. Wagner's attorney did not provide professionally unreasonable assistance when he tried to spin that statement as one that would help his client rather than hurt him.

Third, Wagner argues that his attorney should have objected when the prosecutor asked Wagner about his prior arrests. Before trial, however, the court had warned Wagner that the prosecution could question him about those arrests if he "opened the door" to such questions. And Wagner did just that on direct examination. When asked whether he had ever been arrested for a violent crime, Wagner initially responded "no sir"—which was false—before giving a slightly more-truthful answer that was fuzzy at best. A fairminded jurist could thus believe that the trial court could properly have allowed the prosecutor's questions about Wagner's arrests, and that Wagner's attorney therefore did not provide professionally unreasonable assistance by choosing not to object. Moreover, given the strength of the state's case—in particular Johnson's testimony that he was certain Wagner was the shooter—a fairminded jurist could also believe that there was no reasonable probability that the jury would have acquitted Wagner even if his attorney had successfully objected.

The Michigan courts reasonably applied *Strickland* when they denied Wagner's ineffective-assistance claims, and thus Wagner is not entitled to habeas on that basis.

D.

Wagner argues that his attorney provided ineffective assistance on appeal. To prevail on this claim, Wagner must first show that his attorney failed to raise a claim that "was clearly stronger than [those] that counsel did present." *Smith v. Robbins*, 528 U.S. 259, 288 (2000). Wagner says that his lawyer should have raised two additional claims on direct appeal: that the prosecutor committed misconduct by asking Wagner about his prior arrests, and that the prosecutor allowed Edwards to lie on the stand. But Wagner's lawyer raised eleven separate claims on direct appeal—some of them strong—alleging a variety of statutory and constitutional violations. The Michigan courts held that Wagner's two new claims were not "clearly stronger" than those eleven. Fairminded jurists could agree with that holding, which means the Michigan courts reasonably applied the Supreme Court's decision in *Robbins*. The district court correctly denied Wagner's habeas petition.

E.

Wagner makes a few other arguments—mostly about things his attorneys could have done better at trial and on appeal—but does so only in "a perfunctory manner, unaccompanied by some effort at developed argumentation." *Leary v. Livingston County*, 528 F.3d 438, 449 (6th Cir. 2008). Those arguments are therefore waived. *Id.*

The district court's judgment is affirmed.